**In re ESTATE OF Gotfred J. SCHULTHEIS, Deceased.**

**Appeal of Robert A. Buttermore and Rose Buttermore.**

Superior Court of Pennsylvania.

Argued Sept. 22, 1999.
Filed Feb. 24, 2000.

Frank S. Kelker, Rochester, for appellants.

James B. Alexander, Clarion, for Shriners Hosp., participating party.

Before EAKIN, LALLY–GREEN and BROSKY, JJ.

LALLY–GREEN, J.:

¶ 1 Appellants Robert A. Buttermore and Rose Buttermore appeal from the Orphans' Court order dated December 8, 1998. This order, *inter alia*, dismissed Appellants' Objections to the Final Account of Patricia A. McFarland, executrix of the estate of decedent Gotfred J. Schultheis. Appellants are the residuary beneficiaries of the decedent's estate.[1]

¶ 2 At issue is the disposition of 1,243 shares of stock in PNC Bank. Briefly stated, the decedent explicitly bequeathed 2,045 shares of stock in PNC Bank to a list of beneficiaries. The executrix later discovered that the decedent owned not 2,045 shares, but 3,288 shares. The executrix allocated the additional 1,243 shares to the beneficiaries on the list. Appellants argue that the additional shares belong in the residuary estate. The Orphans' Court rejected this claim and affirmed the executrix's disposition. Finding no abuse of discretion or error of law, we affirm.

---

1. Appellants are the decedent's brother-in-law and sister, respectively.

¶ 3 The facts of the case are as follows. The decedent died on June 2, 1997, leaving a Last Will and Testament dated December 21, 1994, and a codicil dated June 9, 1995. Docket Entries 1–3. Relevant portions of the will read as follows:

**ARTICLE III.**

I give my shares of stock in the bank now or formerly known as PNC (whether by change of name, consolidation, merger, or other cause), if own [sic] by me at the time of my death, together will [sic] all dividends declared thereon but not paid at the time of my death and all rights and benefits thereof as follows:

[A.   100 shares to Helen Lawrence;

B.   100 shares to Gretchen Bickerstaff;

C.   100 shares to Daniel Bickerstaff;

D.   100 shares to Douglas Bickerstaff;

E.   100 shares to Malorie McFarland;

F.   200 shares to Donald Christy;

G.   200 shares to Andrew Schultheis;

H.   200 shares to Parker Devey and Audrey Devey; and

I.   945 shares to the Shriners Children's Home in Erie, PA.]

If there shall be any change of capital structure of the bank now or formerly known as PNC after the date of this will which effects [sic] the number of shares I own or am entitled to, I direct that the total number of shares owned by me at my death shall be allocated and distributed to the beneficiaries listed in this Article in the same ratio or proportion as the shares are presently distributed in this Article.

**ARTICLE VIII.**

I give my residuary estate, being all property, real or personal, wherever situated, in which I may have any interest at my death, not otherwise effectively disposed of, but not including any prop-

erty over which I have power of appointment, equally to [Appellants] ROBERT A. BUTTERMORE and ROSE BUTTERMORE[.]

Docket Entry 2 at 1–5. Through the codicil, the decedent revoked his gift of 200 shares to the Deveys and increased by 200 shares his gift to Andrew Schultheis. Docket Entry 3. In all other respects, the codicil confirmed and republished the original will. *Id.*

¶ 4 As noted above, the will and codicil expressly dispose of 2,045 shares of PNC stock. After the decedent's death, the executrix discovered that the decedent actually owned 3,288 shares of PNC stock, not 2,045 shares. Docket Entry 30 at 5–6. Moreover, these shares were not all of one class; 2,448 shares were of common stock (worth $41.75 per share on the date of the decedent's death) and 840 shares were of preferred stock (worth $67.00 per share on the date of the decedent's death). *Id.*; *see also* Docket Entry 9, Schedule B.

¶ 5 On March 2, 1998, nine months after the decedent's death, the executrix deposited the required inheritance tax with the Clarion County Register of Wills. Docket Entry 9 at 1. Because the executrix did not deposit an estimated inheritance tax within three months, she failed to take advantage of a 5% discount provided by 72 Pa.C.S. § 9142.[2] Docket Entry 30 at 65.

¶ 6 On July 17, 1998, the executrix filed a First and Final Administration Account and Statement of Proposed Distribution. Docket Entry 11. An amended Account was filed on July 28, 1998. Docket Entry 12. Under this Account, the additional 1,243 shares would be distributed *pro rata* to the Article III beneficiaries rather than to Appellants. *Id.* at 7. Appellants filed objections to the Account on August 3, 1998, arguing that (1) the additional shares belong in the residuary estate; and (2) the

---

**2.** This section reads as follows: "Inheritance tax is due at the date of the decedent's death and shall become delinquent at the expiration of nine months after the decedent's death. To

the extent that the inheritance tax is paid within three months after the death of the decedent, a discount of five per cent shall be allowed." 72 P.S. § 9142.

executrix should be surcharged in an amount equal to the 5% discount, "plus any interest subsequently assessed by reason of being required to file an amended Pennsylvania Transfer and Inheritance Tax return." Docket Entry 13 at 7–9.

¶ 7 The Orphans' Court held an evidentiary hearing on November 18, 1998. Docket Entry 30. The decedent's attorney, Richard Kooman, testified that the decedent first approached him on December 2, 1994, to prepare the will at issue. *Id.* at 40–41. During this meeting, the decedent convinced Attorney Kooman that the decedent owned only 2,045 shares. *Id.* at 42, 59–61. Attorney Kooman asked for the stock certificates, but the decedent did not have them. *Id.* at 45. The decedent stated that they were in Florida. *Id.* Attorney Kooman never saw the certificates, and was never aware of any additional shares. *Id.* at 45–46. Attorney Kooman testified that he used the words "my shares of stock" to describe the 2,045 shares in Article III because "[i]t was my understanding from talking to him, that he only owned 2,045 shares, and it was his intention to give away all the stock that he had in PNC to the designated beneficiaries in Article III." *Id.* at 48.

¶ 8 The executrix testified as follows. The decedent asked her to help him obtain replacement stock certificates. *Id.* at 9.[3] She helped the decedent fill out a form to obtain replacement certificates; however, she does not remember the number of shares that she listed on that form. *Id.* at 10. She was not aware of the number of shares that he listed in his will. *Id.* at 13. PNC Bank mailed replacement certificates to the decedent, who placed the **unopened** envelope in a safety deposit box. *Id.* at 9–

11, 35. The executrix found the unopened envelope in the safety deposit box after the decedent's death. *Id.* at 35. Thus, it appears from the record that the additional shares were discovered only after the decedent's death.

¶ 9 On December 8, 1998, the Orphans' Court dismissed Appellants' objections and denied their application for a surcharge. Docket Entry 24.[4] The court held that the will was ambiguous and that extrinsic evidence was properly introduced to discover the decedent's intent. *Id.* The court concluded that the decedent intended to grant all of his PNC shares to the Article III beneficiaries. *Id.* This appeal followed.

¶ 10 Appellants raise four issues on appeal:

I. Did the lower court err in interpreting the will of the decedent, and the codicil thereto, thereby affirming the account of the executrix and dismissing the objections to the account when the lower court refused to order distribution of 1,243 shares of the decedent's PNC stock to the ARTICLE VIII residuary beneficiaries, the appellants herein, but rather affirmed the distribution of all 3,288 shares of the decedent's PNC stock to the ARTICLE III beneficiaries when the will and codicil bequeathed only 2,045 shares of such stock to said ARTICLE III beneficiaries?

II. Did the lower court err when it determined that the will and codicil were ambiguous and therefore admitted at the hearing held on the objections and application, over objection, extrinsic evidence which apparently resulted in, or

---

3. The decedent thought he needed replacement certificates because he could not find his original stock certificates. *Id.* at 9. The decedent assumed that the original certificates were in his Air Stream trailer, which had been destroyed in an accident. *Id.*

4. The Orphans' Court did not write an extensive post-trial opinion or an opinion under Pa.R.A.P.1925. Rather, it adopted and incorporated by reference the Orphans' Court briefs of the executrix and Shriners Hospitals for Children ("Shriners"). Docket Entries 24, 35. The court did "specifically hold that the will is ambiguous and [is] in complete agreement with the proposition that the court would be in error to consider any extrinsic evidence if the will was not ambiguous." Docket Entry 24, citation omitted.

contributed to, the action above complained of?

III. Should the executrix be surcharged for any interest that might be assessed by the Pennsylvania Department of Revenue due to the erroneous interpretation of the decedent's will by the executrix whereby the residuary share of the objectors will be further reduced?

IV. Should the executrix be surcharged for neglecting to make an estimated payment of Pennsylvania Transfer and Inheritance Tax thereby losing the benefit of the 5% discount whereby the residuary share of the objectors is reduced?

Appellants' Brief at 4–5. For ease of review we have renumbered Issues III and IV.

¶ 11 Our standard of review is well-settled.

The findings of a judge of the orphans' court division, sitting without a jury, must be accorded the same weight and effect as the verdict of a jury, and will not be reversed by an appellate court in the absence of an abuse of discretion or a lack of evidentiary support.

This rule is particularly applicable to findings of fact which are predicated upon the credibility of the witnesses, whom the judge has had the opportunity to hear and observe, and upon the weight given to their testimony. In reviewing the Orphans' Court's findings, our task is to ensure that the record is free from legal error and to determine if the Orphans' Court's findings are supported by competent and adequate evidence and are not predicated upon capricious disbelief of competent and credible evidence. However, we are not limited when we review the legal conclusions that Orphans' Court has derived from those facts.

*In re Estate of Rider,* 711 A.2d 1018, 1020 (Pa.Super.1998) (quoting *In re Estate of Harrison,* 456 Pa.Super. 114, 689 A.2d 939, 942–43 (1997)).

¶ 12 Because Appellants' first three issues are interrelated, we will address them together. Appellants claim that the will expressly and unambiguously grants 2,045 shares to the Article III beneficiaries. Appellants' Brief at 16. They also argue, "it is patently obvious that on [the date of the codicil,] June 9, 1995, [the decedent] had reviewed his testamentary scheme" and decided to change only one aspect of the will: specifically, revoking a gift to the Deveys and increasing a gift to Andrew Schultheis. *Id.* at 17. Appellants further argue that if the decedent had intended to give away **all** of his shares to the Article III beneficiaries, he could have done so by reference to percentages of his total holdings (*e.g.,* 10% to Helen Lawrence, etc.) rather than by reference to specific numerical amounts. *Id.* Finally, Appellants point out that the decedent did allow for a *pro rata* increase in shares under only one condition: a change in the stock structure of PNC Bank, which never took place. *Id.* Appellants conclude that the court should not have admitted extrinsic evidence because it is possible to effectuate the testator's intent (namely, to grant 2,045 shares to the Article III beneficiaries) [5] without regard to extrinsic evidence. *Id.* at 20.

¶ 13 In *Rider,* we set forth the following standards applicable to the interpretation of wills.

The testator's intent is the polestar in the construction of every will and that intent, if it is not unlawful, must prevail.

In order to ascertain the testamentary intent, a court must focus first and foremost on the precise wording of the will, and if ambiguity exists, on the circumstances under which the will was execut-

---

**5.** Appellants do not contend that the Article III beneficiaries are entitled only to common stock. Rather, they propose a formula by which those beneficiaries would receive a mix of common stock and preferred stock. Appellants' Brief at 27–28.

ed, only if the testator's intent remains uncertain may a court then resort to the general rules of construction. The words of a will are not to be viewed in a vacuum but rather as part of an overall testamentary plan.

When interpreting a will, we must give effect to word and clause where reasonably possible so as not to render any provision nugatory or mere surplusage. Further, technical words must ordinarily be given their common legal effect as it is presumed these words were intentionally and intelligently employed, especially where they are used by someone learned in probate law.

Courts are not permitted to determine what they think the testator might or would have desired under the existing circumstances, or even what they think the testator meant to say. Rather, the court must focus on the meaning of the testator's words within the four corners of the will. Finally, a court may not rewrite an unambiguous will.

*Rider*, 711 A.2d at 1021 (quoting *Harrison*, 689 A.2d at 943).

▮▮▮▮ ¶ 14 There are two types of ambiguity: patent and latent. *In re Estate of Beisgen*, 387 Pa. 425, 431, 128 A.2d 52, 55 (1956); *Krizovensky v. Krizovensky*, 425 Pa.Super. 204, 624 A.2d 638, 643 (1993) (describing ambiguities in a contract). We described the difference between patent and latent ambiguity as follows.

A patent ambiguity appears on the face of the [document] and is a result of defective or obscure language. A latent ambiguity arises from collateral facts which make the meaning of a written [document] uncertain, although the language appears clear on the face of the [document]. To determine whether there is an ambiguity, it is proper for a court to hear evidence from both parties and then decide whether there are objective indications that the terms of the [document] are subject to differing meanings.

*Krizovensky*, 624 A.2d at 643. "Where a latent ambiguity exists we have repeatedly held that parol evidence is admissible to explain or clarify the ambiguity, irrespective of whether the latent ambiguity is created by the language of the Will or by extrinsic or collateral circumstances." *Beisgen*, 387 Pa. at 431, 128 A.2d at 55; *see also In re Bloch*, 425 Pa.Super. 300, 625 A.2d 57, 61 (1993) (same); *Estate of McKenna*, 340 Pa.Super. 105, 489 A.2d 862, 865 (1985) (where the court cannot confidently discern the testator's intent from the will itself, the court may "inquire into the circumstances of the testator at the time of execution of his will and other evidence which bears on intent"). Where a latent ambiguity exists, the court may resort to parol evidence (such as testimony of the scrivener) to determine the decedent's true intent. *McKenna*, 489 A.2d at 867. One limitation to the foregoing is that "[e]xtrinsic evidence of surrounding facts must only relate to the meaning of ambiguous words of the will. It cannot be received as evidence of testator's intention independent of the written words employed." *Beisgen*, 387 Pa. at 431, 128 A.2d at 55.

¶ 15 Turning to the language of the will, we find no patent ambiguity, but we do find a latent ambiguity. The will, taken strictly on its face and without regard to external facts and circumstances, does not contain inherently defective or obscure language. Thus, no patent ambiguity exists.

¶ 16 The will does, however, contain a latent ambiguity when extrinsic circumstances are taken into account. Specifically, we find that the phrase "I give my shares of stock ... as follows" is ambiguous, because it is unclear whether this phrase refers to only 2045 shares or to **all** of the stock owned by the decedent at the time of his death.

▮▮▮ ¶ 17 When extrinsic circumstances are considered, we conclude that the decedent intended the phrase to mean all of the stock that he owned. Several factors con-

tribute to this conclusion. First, the phrase "I give my shares of stock ... as follows" gives the impression that the decedent intends to bequeath **all** of his stock in the manner described. Next, the will expressly grants stock only to the Article III beneficiaries and not to any other beneficiaries or to the residuary estate. This fact supports the conclusion that the Article III beneficiaries are the only parties entitled to stock under the will. Third, Article III states that in the event of a change in the capital structure of PNC Bank which results in a change in the number of shares the decedent owns, the Article III bequest shall be adjusted proportionally. Thus, Article III suggests an intent to grant all shares to the Article III beneficiaries in the proportions suggested by the list. Finally, we note that the decedent owned different classes of stock at the time of his death. Article III does not specify whether the beneficiaries are to receive common stock, preferred stock, or some combination of the two. Accordingly, the fact that the decedent listed 2,045 shares in Article III could simply reflect a **mistaken understanding** that he owned 2,045 shares, rather than an **express intent** to grant only 2,045 shares to the Article III beneficiaries. For all of these reasons, we conclude that the Orphans' Court did not err in determining that the phrase "my shares of stock" is ambiguous and in admitting parol evidence to clarify the ambiguity.

¶ 18 Cases cited by Appellants do not compel a different result. In *In re Woodward's Estate*, 407 Pa. 638, 182 A.2d 732 (1962), the decedent bequeathed "thirty shares of [AT & T] stock" to Vera Walls and "thirty-five shares of [AT & T] stock" to Henry Walls. *Woodward*, 407 Pa. at 639, 182 A.2d at 732. At the time the decedent wrote the will, she owned a total of 143 shares. A residuary clause granted the remainder of the estate to various nieces and nephews. Before she died, AT & T stock split three-for-one; accordingly, the decedent owned 429 shares at the time of her death. Vera and Henry Walls ar-

gued that in light of the stock split, they were entitled to three times the number of shares listed in the will. Our Supreme Court rejected this claim, reasoning as follows:

> She clearly said at the time she made her will that she wished to give 30 shares to Vera and 35 shares to Henry and she wished her residuary estate to be divided among her five named nephews and nieces. Two years later, the A.T. and T. stock was split three-for-one. Testatrix received these additional shares of stock and owned and possessed them for over a year before her death, but never changed her will. How can we then change it for her?

*Id.* at 640–641, 182 A.2d at 733. As Appellants recognize, the rule in *Woodward* concerning stock splits has been abrogated by statute. *See* 20 Pa.C.S.A. § 2514(17).

¶ 19 Appellants argue that even disregarding the stock split question, *Woodward* stands for the proposition that "the shares of stock not disposed of comprise part of the residuary." Appellants' Brief at 19. We disagree, and find *Woodward* factually distinguishable. In *Woodward*, the decedent simply granted "30 shares" of AT & T stock to Vera Walls and "35 shares" of AT & T stock to Henry Walls. The *Woodward* will never described these shares as "my shares of stock", or otherwise suggested that these shares represented **all** of the AT & T stock that the decedent owned. In contrast, for the reasons set forth above, the decedent in the instant case did imply that he intended to give all of his PNC stock to the Article III beneficiaries.

¶ 20 Next, Appellants cite *In re Estate of Kelly*, 473 Pa. 48, 373 A.2d 744 (1977) for the proposition that no ambiguity exists because "a subject exists which satisfies the terms of the will." Appellants' Brief at 20. In other words, the Orphans' Court should not have heard extrinsic evidence of the decedent's intent because the subject matter of the bequest (2,045 shares

of PNC stock) was identifiable, in existence, and could be distributed to the Article III beneficiaries without regard to the fact that the decedent may have owned additional shares. *Id.* at 23.

¶ 21 In *Kelly*, the decedent bequeathed to his wife "that share of my estate to which she would be entitled" under Pennsylvania's intestacy laws. *Kelly*, 473 Pa. at 50, 373 A.2d at 745–746. A residuary clause granted the remainder of the estate to Mary Hay. *Id.* at 50, 373 A.2d at 746. Under Pennsylvania's intestacy laws, the decedent's wife was entitled to the entire estate because the decedent left no children, siblings, nieces, nephews, grandparents, aunts, or uncles. *Id.* at 51, 373 A.2d at 746. Ms. Hay was the decedent's cousin and this fact did not affect the wife's entitlement to the entire estate. *Id.*

¶ 22 The Orphans' Court found the will ambiguous because the decedent failed to describe Ms. Hay's relationship to the decedent. *Id.* As such, the court held a hearing, at which the scrivener testified that the decedent told him that Mary Hay was his aunt. *Id.* Our Supreme Court reversed, holding that the Orphans' Court should not have admitted extrinsic evidence because the will was unambiguous.[6] The Supreme Court found that the failure to identify Mary Hay in the will did not create an ambiguity. Rather, it was undisputed that Mary Hay was a first cousin and that her status as such did not affect the wife's intestate share:

Under these circumstances, it was unnecessary to admit any extrinsic evidence to determine the widow's share. Moreover, even if it had been necessary to admit and consider extrinsic evidence as to what relatives survived the testator in order to ascertain the widow's share,

it does not follow that the door was open for the use of extrinsic evidence for a different purpose. Evidence as to what persons survived the testator is entirely different from evidence to show that the testator intended a disposition other than that plainly provided in the will. *Id.*

¶ 23 Next, the Court held that while the scrivener's testimony "would suggest an ambiguity," the fact remains that "an ambiguity in a will must be found without reliance on extrinsic evidence before the extrinsic evidence is admissible." *Id.* at 54, 373 A.2d at 747. It is in this context that our Supreme Court wrote the following passage, cited by Appellants:

A latent ambiguity can exist only when necessary to identify the subject matter or object of a devise and if there is in existence a subject or object that satisfies the terms of the will, and to which they are applicable, there is no occasion for the introduction of parol evidence, and a doubt suggested by extrinsic circumstances cannot be permitted to affect its construction.

*Id.* (citation omitted).

¶ 24 Appellants' case is distinguishable from *Kelly*. *Kelly* holds that parol evidence of the decedent's subjective intent is inadmissible when the will and surrounding circumstances unambiguously point to a contrary intent. To allow parol evidence in such circumstances would "open[ ] the door to fraud [or] changing or defeating the testator's intention." *Id.* at 54, 373 A.2d at 748. Here, as noted above, the will and surrounding circumstances created a latent ambiguity as to whether the decedent intended to grant all of his shares to the Article III beneficiaries.[7] When a latent ambiguity exists, the court

---

**6.** In *Kelly*, the Orphans' Court also found the will ambiguous because granting the wife the entire estate would render the residuary clause a "nullity." 473 Pa. at 52, 373 A.2d at 746. Our Supreme Court disagreed, holding that the existence of a residuary clause as a possible "escape hatch" does not necessarily imply that a residuary estate must exist. *Id.* at 53, 373 A.2d at 747.

**7.** Extrinsic circumstances can create a latent ambiguity, even when the will itself does not appear to be ambiguous on its face. *Beisgen*, 387 Pa. at 431, 128 A.2d at 55.

may then accept parol evidence to determine the decedent's true intent. *McKenna*, 489 A.2d at 867.[8]

¶ 25 Next, Appellants cite *In re Connolly's Estate*, 166 Pa.Super. 383, 71 A.2d 856 (1950). In that case, the decedent left a will granting "25 shares of stock in the Curtis Publishing Company" to a certain beneficiary. *Id.* at 857. The decedent owned 21 shares of preferred stock and 53 shares of common stock at the time of his death. *Id.* The Orphans' Court allowed the beneficiary to select all 21 shares of preferred stock and four shares of common stock. *Id.* The decedent's sister and sole heir objected to this disposition, arguing that the word "stock" was ambiguous because it does not specify the class of stock. We disagreed, holding that "a subject exists which satisfies the terms of the will, and to which it is perfectly applicable." *Id.* at 858 (citation and brackets omitted).

¶ 26 In our view, *Connolly* does not stand for the broad proposition cited by Appellants: namely, that a will is unambiguous whenever an identifiable "subject exists which satisfies the terms of the will." Appellants' Brief at 20. Rather, the test for ambiguity is whether the testator's intent is uncertain, given the language of the will and the surrounding circumstances. *See, e.g., Estate of McKenna*, 489 A.2d at 865. Moreover, the issue in the instant case is not whether the word

"stock," standing alone, is ambiguous. Rather, the question is whether the phrase "I give my shares of stock ... as follows" refers to all of the decedent's shares, or the 2,045 shares listed in Article III. For the reasons set forth above, we restate our conclusions that the Orphans' Court did not err in concluding that under the unusual circumstances of this case, the phrase "I give my shares of stock ... as follows" is ambiguous because the testator's intent was unclear and that parol evidence of the testator's intent was admissible.

¶ 27 The Orphans' Court concluded that the parol evidence established that "the testator believed he only owned 2045 shares of stock in PNC." Orphans' Court Memorandum and Order, 12/8/98, adopting Shriners' Brief at 3. Appellants do not dispute the Orphans' Court's findings in this respect. Also, they do not dispute the court's ultimate conclusion that this parol evidence established an intent to grant all PNC shares to the Article III beneficiaries. Accordingly, the Orphans' Court did not err when it affirmed the executrix's account. Thus, Appellants' first and second issues lack merit. Because Appellants' third issue is premised on the erroneous conclusion that the executrix misinterpreted the will, this claim is dismissed as well.[9]

8. In *McKenna*, the decedent granted "all of my personal property of whatever kind and wherever located" to a grandnephew. *McKenna*, 489 A.2d at 864. A second clause directed that his residuary estate was to be divided between two charities. *Id.* Aside from specific bequests not relevant here, the decedent's estate consisted of a 1977 Plymouth Volare and over $150,000 in stocks, bonds, and cash. *Id.* The grandnephew argued that he was entitled to the stocks, bonds, and cash because they represented "personal property" of the decedent. *Id.* We disagreed, holding that the phrase "personal property" was ambiguous when the will was read as a whole. *Id.* at 866. Specifically, we noted that while "personal property" ordinarily includes stocks, bonds, and cash, "it is not always so." *Id.* (citations omitted). Moreover, we noted that the grandnephew's inter-

pretation would render the residuary clause a nullity and conflicted with other clauses in the will where the decedent bequeathed personal property to others. *Id.* In light of this ambiguity, we affirmed the Orphans' Court's decision to allow parol evidence of the decedent's intent. *Id.* at 867. The scrivener of the decedent's will testified that the decedent intended to give the stocks, bonds, and cash to the charities, and that the grandnephew was entitled to the automobile. *Id.*

9. Appellants' third issue is that the executrix should be surcharged for interest that will be imposed because she will have to file an amended inheritance tax return. Appellants' Brief at 30–31. This argument is premised on the assumption that she failed to allocate the PNC shares to the proper beneficiaries. *Id.* Because the executrix did not err in allocating

¶ 28 Finally, Appellants argue that the executrix is subject to a surcharge because she failed to take advantage of the 5% discount provided by 72 Pa.C.S. § 9142. Appellants' Brief at 28–29 (citing *Estate of Geniviva*, 450 Pa.Super. 54, 675 A.2d 306 (1996)). In *Geniviva*, we recited the following standards appropriate to this issue:

> An executor, as a fiduciary of the estate, "is required to use such common skill, prudence and caution as a prudent man, under similar circumstances, would exercise in connection with the management of his own estate." *In re Estate of Lohm*, 440 Pa. 268, 273, 269 A.2d 451, 454 (1970). Further, the executor has the duty to pay the federal estate tax, and neglect of this duty will result in the executor's personal liability. *In re Estate of Maurice*, 433 Pa. 103, 249 A.2d 334 (1969). In addition, a surcharge may be imposed on the executor to compensate the estate for any losses incurred by the executor's lack of due care. *In re Dobson's Estate*, 490 Pa. 476, 417 A.2d 138 (1980). When seeking to impose a surcharge against an executor for the mismanagement of an estate, those who seek the surcharge bear the burden of proving the executor's wrongdoing. *Lohm, supra.* However, where a significant discrepancy appears on the face of the record, the burden shifts to the executor to present exculpatory evidence and thereby avoid the surcharge. *Id.*

*Id.* at 310–311. In *Geniviva*, we held that an executor was liable for a surcharge because he failed to pay estate taxes until almost four years after the decedent's death. *Id.* As with inheritance taxes, estate taxes are due nine months after the decedent's death. *Id.* We rejected the executor's claim that faulty legal advice excused his liability for the surcharge. First, we held that the executor knew or should have known that the estate would have to file tax returns. *Id.* Next, because a significant penalty was imposed for the executor's failure to comply with tax laws, the burden shifted to the executor to prove that he acted with the skill and caution of a reasonably prudent person. *Id.* We held that given the attorney's grossly faulty handling of the case, the executor did not act prudently in continuing to seek advice from that attorney. *Id.*

¶ 29 The primary question in the instant case is whether the executrix's failure to take advantage of the 5% discount constitutes a breach of due care. Section 9142 determines whether an executor has met, breached, or exceeded the standard of due care. Under § 9142, the inheritance tax is due nine months after the decedent's death. After nine months has elapsed, the tax is considered delinquent. *Id.* If the tax is paid within three months, a discount of 5% is allowed. *Id.* Thus, under § 9142, an executor meets the standard of care by paying the inheritance tax within nine months after the decedent's death.

¶ 30 The record reveals that the executrix paid the tax within nine months of the decedent's death. Docket Entry 9. Appellants do not contend that she allowed the tax to become delinquent. *Id.* Thus, the record reflects that she met the appropriate standard of care. Moreover, in accordance with § 9142, the executrix's failure to take advantage of the discount does not constitute a "loss" for which the executrix may be surcharged because a loss occurs only after the estate has been **penalized** for breaching the standard of care. The Orphans' Court did not err when it refused to impose a surcharge.[10]

¶ 31 Order affirmed.

---

the PNC shares, she will not be required to file an amended return.

**10.** In the alternative, Appellants argue that a surcharge should be imposed because "the

estate had sufficient liquidity to pay the inheritance tax at discount." Appellants' Brief at 30. Appellants cite no legal authority for the proposition that this fact justifies a surcharge. Accordingly, we reject this claim.