2020 PA Super 86

| | | |
|---|---|---|
| SBA TOWERS II LLC | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| WIRELESS HOLDINGS, LLC AND | : | No. 325 WDA 2018 |
| JEFF MACALARNEY | : | |

Appeal from the Order Entered February 8, 2018
In the Court of Common Pleas of Blair County Civil Division at No(s):
2016 GN 01215

BEFORE:  BOWES, J., SHOGAN, J., LAZARUS, J., OLSON, J., STABILE, J.,
DUBOW, J., KUNSELMAN, J., NICHOLS, J., MURRAY, J.

OPINION BY MURRAY, J.:                                   **FILED APRIL 6, 2020**

SBA Towers II LLC (Appellant) appeals from the order granting in part and denying in part Appellant's motion for a permanent injunction.  We first conclude that, pursuant to Pa.R.A.P. 311(a)(4), this appeal is properly before this Court despite Appellant's failure to file a post-trial motion.  Upon careful review, we further hold that the trial court erred in finding a contract ambiguity.  We thus affirm in part and reverse in part.

The notes of testimony from the May 8, 2017 evidentiary hearing reveal that on December 18, 2009, Appellant executed a lease with Appellee, Wireless Holdings (Wireless Holdings), to rent an outdoor cellular tower and an indoor "shelter" in Altoona, Pennsylvania.  N.T., 5/8/17, at 2.  Appellant sub-leased the outdoor tower to cell phone carriers, including Verizon, as well

as to the State Police, the Federal Bureau of Investigation, and the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). *Id.* at 14, 23. The shelter was located on the second floor of Wireless Holding's building, and it housed Verizon equipment that enabled cellular communications through the tower. *Id.* at 26.

Pertinently, Paragraph 18 of the parties' lease stated:

Access to Leased Space/Premises. [Appellant] shall have at all times during the initial term or renewal term the right of access to and from the Leased Space and all utility installations servicing the Leased Space on a 24 hours per day/7 days per week basis, on foot or by motor vehicle, including trucks, and for the installation and maintenance of utility wires, cables, conduits and pipes over, under and along the right-of-way extending from the nearest accessible public right-of-way.

Lease, 12/18/09, at 4.

For six years, Appellant accessed the shelter *via* a lockbox, located on the outside of the building. N.T., 5/8/17, at 11. Meanwhile, Appellant's tenants and their subcontractors could access the property by calling Appellant's "knock center" or signing into an "app." *Id.* at 25. According to Appellant, it, as well as its tenants, required 24-hour access to the leased premises to perform any necessary repairs. *Id.* at 14.

In approximately 2016, Wireless Holdings became concerned with possible theft and equipment damage, arising from: the disappearance of a key from the lockbox; the presence, in the building, of "millions of dollars of inventory" owned by Wireless Holding's sister company, ComPros; the presence of Blair County's 911 call system as another tenant; the presence of

an unidentified individual in the building, which involved a response from the Logan Township Police; another individual who "stalk[ed]" a Wireless Holdings employee and was detained by the police; and the presence of a nearby hotel that was "a magnet for crime." *See* N.T., 5/8/17, at 35, 54, 67, 80. Wireless Holdings thus removed the lockbox and imposed the following regulations: Appellant, its tenants, and their contractors were to check-in upon entering the building; Appellant's tenants and contractors were to submit to criminal background checks in order to enter the building; and for access to the property outside regular business hours, Appellant was to call Wireless Holdings and a representative would meet at the property to allow entry. *See id.* at 14, 34, 37-38, 67-68.

On April 15, 2016, Appellant filed the underlying motion for a temporary injunction against both Wireless Holdings and Jeff MacAlarney, an employee of Wireless Holdings.[1] The motion averred that the parties' lease did not permit Wireless Holdings to enforce the new check-in or criminal background conditions. The motion further averred that Wireless Holdings was physically blocking Appellant's access to the tower by storing cable and debris in front of a gate, and requested an injunction prohibiting such interference. The trial court issued a preliminary injunction, temporarily granting the requested

---

[1] While the parties' 2009 lease identified Mr. MacAlarney as the president of Wireless Holdings, the May 8, 2017 hearing transcript did not identify his position.

relief. Wireless Holdings filed preliminary objections, which did not address whether its conduct was permissible under the terms of the lease.[2]

The trial court conducted an evidentiary hearing on May 8, 2017. Appellant called its regional operations manager, Jason Dellavalle, who testified that he managed 270 cell towers throughout central and western Pennsylvania, and Appellant had "24/7 access" at all but one of these towers and Wireless Holdings' building. N.T., 5/8/17, at 8-9, 11. Appellant's employees, carriers, maintenance workers, and utility companies all need access to the cell towers in order to repair equipment as quickly as possible. *Id.* at 9, 13-14. On separate occasions, one of Appellant's contractors and a Verizon employee were denied access to the property, and in November of 2016, Mr. Dellavalle himself was told by Mr. MacAlarney that Mr. Dellavalle could not be there because he had not signed in. *Id.* at 12, 16-17, 27. Finally, Wireless Holdings placed bags of salt, debris, and spools of cable in such a way as to block both Appellant's and Verizon's access to the property. *Id.* at 18, 20, 22, 31-32.

Appellant also called as a witness Mr. MacAlarney, who testified about

---

[2] Instead, the preliminary objections averred that Appellant failed to file a complaint; failed to establish that Mr. MacAlarney was a properly-named defendant; and failed to plead any facts justifying an injunction. Wireless Holdings further argued that an injunction was unnecessary because any person wishing to access the shelter could "easily obtain the necessary criminal background" check. Wireless Holdings' Preliminary Objections, 4/15/16, at 3.

Wireless Holdings' security concerns, as outlined above. N.T., 5/8/17, at 54, 59. He stated that Wireless Holdings merely wanted individuals visiting the property to be accompanied by Appellant's or Verizon's employees, and if they were not, to check in or, if they were a regular visitor, to establish "credentials." *Id.* at 63, 77-79. Mr. MacAlarney estimated that over a year, a subcontractor will visit the shelter once or twice, and Verizon employees may visit once or twice a month. *Id.* at 81. Mr. MacAlarney denied that Wireless Holdings ever blocked access, because anyone wishing to visit could comply with the conditions. *Id.* at 65. With respect to the after-hours call-in procedure, Mr. MacAlarney stated that Wireless Holdings has "technicians on call 24/7" and they could typically arrive at the property within 15 to 20 minutes. *Id.* at 66, 82.

Additionally, Mr. MacAlarney stated that criminal background checks for building visitors was a condition imposed on Wireless Holdings by another tenant, the Blair County 911 call center. N.T., 5/8/17, at 61-62, 68; *see also* Trial Court Opinion, 2/8/18, at 5. Mr. MacAlarney conceded, however, that Wireless Holdings' lease with Appellant did not provide for criminal background checks, and Appellant's lease preceded Wireless Holdings' lease with the Blair County 911 call center. *Id.* at 60-63, 68, 84. Finally, Mr. MacAlarney denied that any equipment was blocking Appellant's access to the property. *Id.* at 47, 75.

Wireless Holdings did not present any evidence, and made no argument

that the lease was ambiguous. Instead, on cross-examination of Mr. Dellavalle, Wireless Holdings suggested that it was reasonable to require individuals to check-in when entering the building, where ComPros had stored "millions of dollars worth of inventory" and individuals in the building "could sabotage the 911 system of Blair County and cause great harm." N.T., 5/8/17, at 34-35. Wireless Holdings also argued that security issues had "changed" from 2009, when the lease was executed.[3] *Id.* at 35-36.

_____

[3] The relevant exchange was:

> [Wireless Holdings:] And are you aware that people within that building have access to millions of dollars worth of inventory from ComPros?
>
> [Mr. Dellavalle:] Don't know.
>
> Q. That they have direct access where they could sabotage the 911 system of Blair County and cause great harm?
>
> A. When we purchased [sic] the tower why wasn't this put in place as soon as we purchased [sic] the tower?
>
> [Wireless Holdings:] Would you acknowledge that the issue of security has changed over time and that the things we found to be silly in 2000 we don't find to be silly now?
>
> A. No.
>
> [Appellant's counsel:] Objection, Your Honor.
>
> BY THE COURT: Well he clearly doesn't have any knowledge of what else might be going on in the building and has said that. . . . .
>
> [Wireless Holdings' counsel:] The point being is that things between when the lease originally was done and now have changed. . . .

Following the hearing, the parties submitted briefs. Appellant requested that the trial court permanently enjoin Wireless Holdings' various restrictions because they were not authorized by the lease terms allowing Appellant free ingress and egress. Meanwhile, Wireless Holdings averred, for the first time, both that nothing in the lease prohibited "reasonable procedures" for access to the property, and the language allowing "24/7" access was ambiguous. Wireless Holdings' Trial Brief, 7/27/17, at 7-8 (unpaginated).

On February 8, 2018, the trial court issued an opinion and the underlying order. It granted in part Appellant's request for a permanent injunction by barring Wireless Holdings from physically blocking Appellant's access to the property with equipment. However, the court denied the request in part by permitting Wireless Holdings to enforce its check-in, after-hours call-in, and criminal background check procedures. The court observed that whereas Appellant would add the word "unrestricted" just before the provision providing "24 hours per day/7 days per week" access, Wireless Holdings would add the phrase "reasonably restricted." Trial Court Opinion, 2/8/18, at 7. The court thus found an ambiguity "because the lease specifically supports neither position." ***Id.***

The court then resolved the perceived ambiguity in Wireless Holdings' favor, finding that the lease should be interpreted to allow "reasonable

N.T., 5/8/17, at 35-36.

restrictions essential to [Wireless Holdings'] duty to provide security for the premises." Trial Court Opinion, 2/8/18, at 8. In support, the court cited another portion of the lease, which it termed the "Hold Harmless Clause," and which stated:

> [Wireless Holdings] will be held harmless by [Appellant] from any liability for damages to any person or any property in or upon the Leased Space at [Appellant's] invitation, or for damages to any person or property resulting from the actions of [Appellant] (including damages caused by or resulting from the existence of the Structures) on the Leased Space, **unless the damages are caused by, or are the result of, the misconduct or negligence of [Wireless Holdings]** or any of [Wireless Holdings'] agents, servants, employees, licensees, or invitees. . .

*Id.* at 8, *quoting* Lease, 12/18/09, at 3 (emphasis added).

Appellant did not file a motion for reconsideration, but filed a timely notice of appeal. The trial court did not issue a Pa.R.A.P. 1925(b) order directing Appellant to file a concise statement of matters complained of on appeal.

At the outset, we consider whether this appeal is properly before us, where Appellant did not file a post-trial motion. This Court issued a *per curiam* order directing Appellant to show cause why this appeal should not be dismissed on this basis pursuant to Pa.R.Civ.P. 227.1(c)(2). Appellant responded that the appeal was proper pursuant to Pa.R.A.P. 311 and ***Thomas A. Robinson Family, Ltd. v. Bioni***, 178 A.3d 839 (Pa. Super. 2017) (***Bioni***). This Court discharged the rule to show cause, but advised that the merits panel may revisit this issue.

- 8 -

Pennsylvania Rule of Civil Procedure 227.1(c)(2) provides: "Post-trial motions **shall** be filed within ten days after . . . the filing of the decision in the case of a trial without jury." Pa.R.Civ.P. 227.1(c)(2) (emphasis added).

In ***Bioni***, the trial court granted a preliminary injunction, which prohibited the defendants from interfering with the plaintiffs' access to a strip of land. ***Bioni***, 178 A.3d at 841. Following a hearing, the court granted a permanent injunction, which barred the defendants from interfering with not only the plaintiffs' access, but also the public's access. ***Id.*** at 842. On appeal by the defendants, this Court considered whether to quash, where the defendants had not filed a post-trial motion. ***Id.*** at 843. We noted that under Rule 227.1,

> a party must file post-trial motions at the conclusion of a trial in **any** type of action in order to preserve claims that the party wishes to raise on appeal. In other words, a trial court's order at the conclusion of a trial, whether the action is one at law or in equity, simply cannot become final for purposes of filing an appeal until the court decides any timely post-trial motions.

***Id.*** at 844 (emphasis in original), *quoting* ***Chalkey v. Roush***, 805 A.2d 491, 496 (Pa. 2002).

However, this Court also considered Pa.R.A.P. 311(a)(4), which provides that an interlocutory appeal may be taken as of right from:

> **(4) Injunctions.**—An order that grants or denies, modifies or refuses to modify, continues or refuses to continue, or dissolves or refuses to dissolve an injunction unless the order was entered:

> \* \* \*

> (ii) After a trial but before entry of the final order.

> Such order is immediately appealable, however, if the order enjoins conduct previously permitted or mandated or permits or mandates conduct not previously mandated or permitted, and is effective before entry of the final order.

Pa.R.A.P. 311(a)(4)(ii). Generally, "it is improper to file a motion for post-trial relief when appealing pursuant to Rule 311." **Bioni**, 178 A.3d at 846, quoting **Nevyas v. Morgan**, 921 A.2d 8, 13 (Pa. Super. 2006). The **Bioni** Court reasoned,

> an appeal may be taken from an order that (because a final judgment has not yet been entered) is not otherwise appealable under Rule 311(a)(4)(ii) if (1) the order enjoins conduct previously allowed or allows conduct previously prohibited, and (2) the injunction takes effect before entry of a final judgment.

**Id.** at 847.

Applying this rationale to the facts before it, the **Bioni** Court observed that the order granting permanent injunctive relief took immediate effect, was not contingent upon entry of a final judgment, and imposed different terms from those under the preliminary injunction (barring interference with the plaintiffs' access, versus barring interference with the plaintiffs' **and** the public's access). **Bioni**, 178 A.3d at 847. This Court concluded that the permanent injunction was an interlocutory order immediately appealable as of right under Rule 311(a)(4)(ii), and thus the defendants were not required to file a post-trial motion before taking an appeal. **Id.** at 847-848.

Applying **Bioni**, we note that in the present case, final judgment was not entered. However, the trial court's permanent injunction took immediate effect, and allowed conduct that was prohibited under the preliminary

injunction — namely, that Wireless Holdings could impose conditions affecting Appellant's access to the property. Accordingly, pursuant to Pa.R.A.P. 311(a)(4)(ii) and the reasoning set forth in **Bioni**, we conclude that this appeal is properly before us. **See** Pa.R.A.P. 311(a)(4)(ii); **Bioni**, 178 A.3d at 847-848.

Appellant presents two issues for our review:

[1.] Whether the Trial Court erred in failing to grant the injunctive relief requested by [Appellant]?

[2.] Whether the Trial Court improperly mandated changes to the parties' lease when no Petition or Bond was posted by [Wireless Holdings] seeking such equitable relief and [Appellant] was not put on notice of the potential that such injunctive relief could be issued?

Appellant's Brief at 2.

In its first issue, Appellant avers that the trial court erred in finding that Paragraph 18 of the parties' lease was ambiguous. Appellant's Brief at 14. Appellant maintains that the plain language and express terms of Paragraph 18 clearly granted it "24/7" access to the property, and nothing in the lease restricted or modified this access. **Id.** at 11-13. Appellant contends that Wireless Holding did not point to any conflicting terms in the lease, but rather "simply advanced a novel argument that the Lease is somehow ambiguous because it did not include the terms 'restricted' or 'unrestricted.'" **Id.** at 14. Appellant asserts that the trial court erred in reading "an ambiguity into an agreement that could easily have been addressed by parties within its express terms." **Id.** at 15-16, *citing* **Wert v. Manorcare of Carlisle PA, LLC**, 124

A.3d 1248 (Pa. 2015). Appellant concludes that the trial court effectively reformed the parties' lease to allow Wireless Holdings to impose restrictions on Appellant's right of access, in contravention of the clear terms of the lease. We agree.

We first recite the law regarding appellate review: "The grant or denial of a permanent injunction is a question of law. Regarding the trial court's legal determination, our standard of review is *de novo*, and our scope of review is plenary." ***Bioni***, 178 A.3d at 843 (citation omitted).

> "The interpretation of a contract is a matter of law and, as such, we need not defer to the trial court's reading of the [a]greement."
>
> > It is also well[-]established that under the law of contracts, in interpreting an agreement, the court must ascertain the intent of the parties.
> >
> > In the cases of a written contract, the intent of the parties is the writing itself. If left undefined, the words of a contract are to be given their ordinary meaning. When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. . . .
>
> With specific reference to what constitutes "ambiguity" in the context of contract interpretation, our Supreme Court has opined as follows:
>
> > Contractual language is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." This is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. We will not, however, distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity.

*Lenau v. Co-Exprise, Inc.*, 102 A.3d 423, 429-430 (Pa. Super. 2014) (citations omitted).

> [Contract] language is not rendered ambiguous "if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends[.]" Mere disagreement between the parties on the meaning of language or the proper construction of contract terms does not constitute ambiguity.

*Betz v. Erie Ins. Exch.*, 957 A.2d 1244, 1253-1254 (Pa. Super. 2008) (citations omitted).

There are two types of contract ambiguity. "[A] latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous." *Betz*, 957 A.2d at 1254 n.2 (citation and parentheses omitted). "The usual instance of a latent ambiguity is one in which a writing refers to a particular person or thing and is thus apparently clear on its face, but upon application to external objects is found to fit two or more of them equally." *Steuart v. McChesney*, 444 A.2d 659, 663 (Pa. 1982) (citations omitted). On the other hand, a "patent ambiguity is that which appears on the face of the instrument, and arises from the defective, obscure, or insensible language used." *Betz*, 957 A.2d at 1254 n.2 (citation and parentheses omitted).

Finally, our Supreme Court:

> long ago emphasized that '[t]he parties [have] the right to make their own contract, and it is not the function of this Court to re-write it, or to give it a construction in conflict with . . . the accepted

and plain meaning of the language used.' "'It is not the province of the court to alter a contract by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves, without regard to its wisdom or folly.'" In 17A C.J.S. *Contracts* § 296(3), appears the following:

> The court may not rewrite the contract for the purpose of accomplishing that which, in its opinion, may appear proper, or, on general principles of abstract justice . . . make for [the parties] a better contract than they chose, or saw fit, to make for themselves, or remake a contract, under the guise of construction, because it later appears that a different agreement should have been consummated in the first instance . . . .

*Steuart*, 444 A.2d at 662 (citations omitted).

As stated above, the parties' lease provides:

> **18. Access to Leased Space/Premises.** [Appellant] shall have at all times during the initial term or renewal term the right of access to and from the Leased Space and all utility installations servicing the Leased Space on a 24 hours per day/7 days per week basis, on foot or by motor vehicle, including trucks, and for the installation and maintenance of utility wires, cables, conduits and pipes over, under and along the right-of-way extending from the nearest accessible public right-of-way.

Lease, 12/18/09, at 4.

We agree with Appellant that the language of Paragraph 18 is not ambiguous. *See Lenau*, 102 A.3d at 429. In granting Appellant "the right of access" to the property and all utility installations servicing the leased space, Paragraph 18 delineated the hours of access ("on a 24 hours per day/7 days per week basis") and the manner of access ("on foot or by motor vehicle, including trucks"). *See* Lease, 12/18/09, at 4. Paragraph 18 also stated that Appellant may access the property to install and maintain utility equipment.

- 14 -

Notably, Paragraph 18 did not impose any restrictions on Appellant's access to the property, and it was silent as to whether Wireless Holdings may, in the future, impose any restrictions. While the trial court interpreted this silence as an ambiguity, we conclude that the lack of any restriction, or provision for future modification, evinced the parties' intent **not** to restrict Appellant's access.

Neither the trial court nor Wireless Holdings addressed whether the alleged ambiguity was patent or latent.[4] **See Betz**, 957 A.2d at 1254 n.2. As the court did not identify any "defective, obscure, or insensible language" appearing on the face of the lease, we infer that it did not find a patent ambiguity. **See id.**

Although a latent ambiguity may arise "from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous," we conclude that the trial court's reliance on Wireless Holdings' **post-lease** security concerns was misplaced. **See Betz**, 957 A.2d at 1254 n.2. This Court's prior findings of a latent ambiguity have generally arisen from the parties' dispute over the meaning of a term present in the contract, not the absence of

---

[4] We note that Wireless Holdings' dual arguments on appeal — that (1) its "check-in procedures" did not interfere with Appellant's "24/7 access" and (2) the lease was ambiguous because it did not define "24/7 access" — are in conflict. **See** Wireless Holdings' Brief at 17, 19. Under the former rationale, Wireless Holdings argues that it complied with the lease terms (which presumably are clear), whereas in the latter, they aver that the lease terms are not clear.

language specifying prospective concerns.

For example, in **In re Estate of Schultheis**, 747 A.2d 918 (Pa. Super. 2000), the testator's will bequeathed "my shares of stock" to nine devisees, listing the specific amounts of shares, which totaled 2,045, to each devisee. **Id.** at 920. The will also gave the residuary estate to the appellants. **Id.** at 919. After the testator's death, however, the executrix learned that the testator in fact owned 3,288 shares of stock. **Id.** The appellants argued that the additional 1,243 shares were a part of the residuary estate, and thus should be given to them. **Id.** This Court concluded that the testamentary term, "my shares of stock," was a latent ambiguity because it was unclear whether the term referred only to the 2,045 shares of stock that the testator believed he owned, or to all of the stock he in fact owned. **Id.** at 923, 926.

Further, in **Z & L Lumber Co. v. Nordquist**, 502 A.2d 697 (Pa. Super. 1985), a contract stated that a builder was "to perform all the labor shown on the working drawings and described in the specifications." **Id.** at 698. "The working drawings and specifications consisted of a series of ten documents[.]" **Id.** This Court concluded that the term "specifications" was a latent ambiguity, where the parties ascribed different meanings: the contractor contended that the "specifications" were limited to the second through sixth drawings, whereas the defendant argued the "specifications" consisted of the seventh and eighth drawings. **Id.** at 700-701.

In the present case, our review reveals that the evidence did not

- 16 -

establish — and the trial court did not find — that when Appellant and Wireless Holdings executed the lease, they ascribed different meanings to any of the existing terms in Paragraph 18. In this regard, we emphasize Mr. MacAlarney's testimony conceding that the lease did not provide for criminal background checks. N.T., 5/8/17, at 60. Instead, as discussed above, the trial court found ambiguity based on the absence, within the detailed paragraph prescribing Appellant's access to the property, of any further specification as to whether the access may be "restricted." This perceived absence of an additional term or condition did not create a latent ambiguity. *See Steuart*, 444 A.2d at 663; *Betz*, 957 A.2d at 1254 n.2. The trial court's rationale would allow a party to modify its contractual rights or obligations, or the other party's rights or obligations, by simply arguing that the contract was silent as to whether that alteration was permissible.

That Wireless Holdings may have become concerned following the execution of the lease about security — however reasonable a concern — is not relevant. *See Lenau*, 102 A.3d at 429 ("When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself."). Appellant kept expensive equipment and property on the leased premises, and the parties, both sophisticated business entities, could have included in the lease, terms allowing Wireless Holdings to impose security procedures. *See Newman Dev. Group of Pottstown, LLC v. Genuardi's Family Mkt., Inc.*, 98 A.3d 645, 659 (Pa. Super. 2014) (*en banc*)

(finding no error in trial court's decision not to reduce landlord's verdict for future damages to present value, where commercial contract was negotiated by sophisticated business people who had the ability to control, decide and design remedies for breach). Instantly, the parties included no such provisions in the lease, and the trial court may not alter that which the "parties have made for themselves, without regard to its wisdom or folly." *See Steuart*, 444 A.2d at 662. Although an ambiguity could, in another scenario, arise from the silence in a contract as to a particular term, Wireless Holdings in this case failed to articulate a basis for finding ambiguity in Paragraph 18 of the lease, *e.g.*, unclear wording or punctuation, the impossibility of enforcement of the contract term as written, or language in another paragraph that would make Paragraph 18 confusing or unworkable.

Finally, we note that it was undisputed that Wireless Holdings' requirement for criminal background checks was implemented due to the condition being imposed by the Blair County 911 call center. *See* N.T., 5/8/17, at 61-62, 68; Trial Court Opinion, 2/8/18, at 5 ("Apparently, the criminal background checks became policy based on the requirements of another tenant at the site (the County 911 Center) which also has millions of dollars of equipment on the property."). The subsequent demands of another tenant do not support the unilateral alteration of the parties' existing Lease. For the reasons discussed above, we reverse the portion of the trial court's order denying in part Appellant's motion for a permanent injunction.

As to Appellant's second issue, Appellant argues that even if the trial court correctly concluded that the lease was ambiguous, the court "improperly mandated changes to the parties' lease" and erred in not considering the parties' course of performance over the first seven years of the lease. In light of our disposition of Appellant's first issue, we need not address this claim.

In sum, and in light of the foregoing, we affirm the trial court's order to the extent it enjoined Wireless Holdings from physically obstructing Appellant's access to the premises. However, we reverse the order to the extent it permitted Wireless Holdings to impose restrictions on Appellant's contractual "24/7" access, *i.e.* by requiring check-ins, after-hours call-ins, and criminal background checks.

Order affirmed in part and reversed in part. Case remanded. Jurisdiction relinquished.

Judge Bowes, Judge Lazarus, Judge Olson, Judge Dubow, Judge Kunselman, and Judge Nichols join the opinion.

Judge Stabile files a concurring dissenting opinion in which Judge Shogan joins.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>4/6/2020</u>