**In re Henry H. WILTON, Deceased.**

**Appeal of John Brislin.**

Superior Court of Pennsylvania.

Argued Nov. 14, 2006.
Filed March 13, 2007.
Reargument Denied May 16, 2007.

**510**

Bradley J. Leber, York, for appellant.

Lavere C. Senft, York, for appellee.

BEFORE: TODD, BENDER and COLVILLE *, JJ.

OPINION BY BENDER, J.:

¶ 1 John Brislin (Appellant) appeals from the January 25, 2006 order of the Orphans' Court Division of the Court of Common Pleas of York County confirming the First and Final Account submitted to the court by John C. Wilton and Lavere C. Senft, Esq., co-executors of the estate of Henry H. Wilton. Essentially, Henry H. Wilton (Testator) and Appellant had been close friends and avid members of the Rose Tree Fox Hunting Club, the oldest fox hunting club in the United States, dating back to 1859. In his will, Testator bequeathed, *inter alia,* his "Rose Tree Hunt memorabilia" to Appellant. The central dispute in this litigation concerns what specific items in the estate qualify as "Rose Tree Hunt memorabilia." Appel-

* Retired Senior Judge Assigned to the Superior Court.

lant contends that the trial court erred in finding that the bequest was unambiguous, and that it erred by defining the scope of "Rose Tree Hunt memorabilia" to items that could be objectively connected to the Rose Tree Fox Hunting Club, rather than including, more generally, other numerous unmarked items relating to fox hunting and equestrian activities. Finding that the trial court did not err or abuse its discretion, we affirm.

¶ 2 Testator, who never married, died on May 14, 2004, at the age of eighty-three. In his Last Will and Testament, dated July 20, 1999, Testator appointed his nephew, John C. Wilton, and Lavere C. Senft, Esq., as the co-executors of his estate. The will contained the following specific bequest to Appellant:

ITEM II: I give and bequeath my saddle and bridle, my double and single harness and tack, all my horse-drawn vehicles, and any Rose Tree Hunt memorabilia to my good friend, [Appellant].

Last Will and Testament of Henry H. Wilton, 7/20/99, at "Item 2." Testator's will was admitted to probate on May 20, 2004, with letters testamentary issued to the co-executors on the same date.

¶ 3 Appellant filed a claim against the estate on October 21, 2004, in which he claimed that he did not receive all of the items of tack and Rose Tree Hunt memorabilia bequeathed to him under Item II of the will. He asserted that many of these items were sold at auction in July and September of 2004. Accordingly, Appellant claimed entitlement to these items, to which he ascribed a total value of $80,850.77.

¶ 4 On March 23, 2005, the co-executors filed their First and Final Account with the orphans' court, in which they noted the existence of Appellant's outstanding claim to various items of personal property, which Appellant had characterized as "Rose Tree Hunt memorabilia." The co-executors asserted that Appellant's claim had no merit, and they ascribed a value of $1,702.00 to what they asserted constituted "Rose Tree Hunt memorabilia."

¶ 5 On April 26, 2005, Appellant filed a written objection to the proposed distribution of the estate as set forth in the First and Final Account. In his written objection, Appellant again claimed that he had not received all of the items of tack and Rose Tree Hunt memorabilia that had been bequeathed to him under Item II of the will. He essentially claimed that the co-executors permitted him to take only certain items, that some items were damaged during the cleaning of Testator's home, that some items were missing, and that other items were sold at auction.

¶ 6 On July 7, 2005, the Honorable Gregory M. Snyder conducted an evidentiary hearing on Appellant's objections to the First and Final Account in order to determine, initially, if there existed an ambiguity. Testimony taken at the hearing developed an extensive factual background on the nature of Appellant and Testator's relationship and the meaning of "Rose Tree Hunt memorabilia," further described in our analysis of the issues in this appeal, *infra.* Following the hearing, Judge Snyder determined that the language employed in the bequest under Item II of the will was not ambiguous. Trial Court Opinion (T.C.O.), 9/15/05, at 1. Accordingly, because he found the language unambiguous, he refused to admit parol evidence to further inquire into Testator's intent. *Id.* at 2.

¶ 7 In accordance with his findings, Judge Snyder entered an order on July 25, 2005, denying all of Appellant's objections to the First and Final Account, with the exception of ordering that the estate adjust its distribution to provide Appellant

with the value of sleigh bells that had been sold at auction. On November 15, 2005, the co-executors filed an amendment to their First and Final Account to provide for a $143.75 distribution to Appellant, representing the value of the bells, and requested the court to adjudicate and confirm the First and Final Account as so amended. Thereafter, on January 25, 2006, the trial court entered an order and adjudication confirming the First and Final Account as amended.

¶ 8 Appellant filed exceptions to the January 25, 2006 order confirming the First and Final Account, in which he argued, *inter alia*, that Item II of the will contained a latent ambiguity and the court improperly ignored parol evidence presented by Appellant with regard to Testator's intent. Exceptions, 2/14/06, at ¶ 1. He objected to the court's definition of "tack," and he asserted, *inter alia*, that Testator "intended to bequeath numerous gifts of fox hunting, equestrian and related mementoes to [Appellant] under the heading of 'Rose Tree Hunt Memorabilia,' not just those items inscribed or marked with the words Rose Tree or the club's insignia." *Id.* at ¶¶ 2, 4.

■ ¶ 9 On February 28, 2006, Judge Snyder denied Appellant's exceptions. On March 17, 2006, Appellant filed a notice of appeal, indicating that he was appealing from the order entered on February 28, 2006, which dismissed his exceptions to the trial court's January 25, 2006 adjudication and confirmation of the First and Final Account as amended. Despite the fact that Appellant appealed from the order dismissing his exceptions, we will treat this appeal as being taken from the final order of January 25, 2006, which confirmed the First and Final Account as amended.[1]

¶ 10 Appellant presents the following two issues in the "Statement of Questions Involved" portion of his brief:

1. Whether the bequest to Appellant under Item II of [Testator's] Will is ambiguous.

2. Whether there was sufficient credible and competent evidence submitted at trial to support the Trial Court's definitions of "tack" and "any Rose Tree Hunt memorabilia" as those terms are used in Item II of [Testator's] Will.

Appellant's brief at 5 ("suggested answers" omitted). As the questions are interrelated, we address them together.[2]

■ ¶ 11 First, we note our standard of review:

The findings of a judge of the orphans' court division, sitting without a

---

1. In this regard, we note that "[i]n a decedent's estate, the confirmation of the final account of the personal representative represents the final order, subject to exceptions being filed and disposed of by the court." *In re Estate of Habazin*, 451 Pa.Super. 421, 679 A.2d 1293, 1295 (1996). Rule 7.1(a) of the Pennsylvania Orphans' Court Rules generally provides that "no later than twenty (20) days after entry of an order, decree or adjudication, a party may file exceptions to any order, decree or adjudication *which would become a final appealable order* under Pa.R.A.P. 341(b) or Pa.R.A.P. 342 *following disposition of the exceptions*. If exceptions are filed, no appeal shall be filed until the disposition of exceptions...." Pa.O.C.R. 7.1(a) (emphasis added).

Thus, the January 25, 2006 order confirming the First and Final Account became appealable on the day the court disposed of Appellant's objections, *i.e.*, on February 28, 2006. Appellant filed his appeal within 30 days of this latter date and, therefore, his appeal is timely. Pa.R.A.P. 903(a). We have revised the caption to reflect that the appeal is properly taken from the confirmation order, following disposition of Appellant's exceptions.

2. Additionally, Appellant did not divide the argument portion of his brief to address each question separately, as required by Pa.R.A.P. 2119(a).

jury, must be accorded the same weight and effect as the verdict of a jury, and will not be reversed by an appellate court in the absence of an abuse of discretion or a lack of evidentiary support.

The rule is particularly applicable to the findings of fact which are predicated upon the credibility of the witnesses, whom the judge has had the opportunity to hear and observe, and upon the weight given to their testimony. In reviewing the Orphans' Court's findings, our task is to ensure that the record is free from legal error and to determine if the Orphans' Court's findings are supported by competent and adequate evidence and are not predicated upon capricious disbelief of competent and credible evidence. However, we are not limited when we review the legal conclusions that [an] Orphans' Court has derived from those facts.

*In re Estate of Elkins*, 888 A.2d 815, 822–23 (Pa.Super.2005) (quoting *In re Estate of Rider*, 711 A.2d 1018, 1020 (Pa.Super.1998) (citations and quotations omitted)).

▆▆▆ ¶ 12 Appellant first argues that the terms "tack" and "Rose Tree Hunt memorabilia" are latently ambiguous. In addressing his argument, we first recognize that "[t]he testator's intent is the polestar in the construction of every will and that intent, if it is not unlawful, must prevail." *Id.* at 823 (quoting *Rider*, 711 A.2d at 1020). Also, we must focus on the "precise wording of the will" and view the words of the will in the context of the overall testamentary plan. *Id.* (quoting *Rider*, 711 A.2d at 1020). We give effect to "word and clause where reasonably possible so as not to render any provision nugatory or mere surplusage." *Id.* (quoting *Rider*, 711 A.2d at 1021). Additionally, we are "not permitted to determine what [we] think the testator might or would

have desired under the existing circumstances, or even what [we] think the testator meant to say. Rather, we must focus on the meaning of the testator's words within the four corners of the will. Finally, a court may not rewrite an unambiguous will." *Id.* (quoting *Rider*, 711 A.2d at 1021).

¶ 13 Also pertinent to our analysis is the following:

There are two types of ambiguity: patent and latent. *In re Estate of Beisgen*, 387 Pa. 425, 431, 128 A.2d 52, 55 (1956); *Krizovensky v. Krizovensky*, 425 Pa.Super. 204, 624 A.2d 638, 643 (1993) (describing ambiguities in a contract). We described the difference between patent and latent ambiguity as follows.

A patent ambiguity appears on the face of the [document] and is a result of defective or obscure language. A latent ambiguity arises from collateral facts which make the meaning of a written [document] uncertain, although the language appears clear on the face of the [document]. To determine whether there is an ambiguity, it is proper for a court to hear evidence from both parties and then decide whether there are objective indications that the terms of the [document] are subject to differing meanings.

*Krizovensky*, 624 A.2d at 643.

*In re Estate of Schultheis*, 747 A.2d 918, 923 (Pa.Super.2000). "Where a latent ambiguity exists we have repeatedly held that parol evidence is admissible to explain or clarify the ambiguity, irrespective of whether the latent ambiguity is created by the language of the Will or by extrinsic or collateral circumstances." *Id.* (quoting *Beisgen*, 128 A.2d at 55).

¶ 14 In the instant case, after an evidentiary hearing, Judge Snyder concluded that there were no objective indications that the terms "tack" and "Rose Tree

Hunt memorabilia" were subject to differing meanings. *Krizovensky*, 624 A.2d at 643; T.C.O. at 2. He concluded that "Rose Tree Hunt memorabilia" unambiguously referred only to items "that objectively can be connected with" the Rose Tree Fox Hunting Club. N.T. Hearing, 7/7/05 & 7/8/05, at 222. As Judge Snyder determined that there was no patent or latent ambiguity in Item II, he further determined that parol evidence was not admissible to discern Appellant's intent. T.C.O. at 1.

¶ 15 In challenging the trial court's conclusions, Appellant argues that the language of Item II contains a latent ambiguity, insofar as both he and co-executors proffered "legitimate, yet divergent, interpretations of what was bequeathed to the Appellant under Item II." Appellant's brief at 10. Under Appellant's interpretation of Item II, he is entitled to receive

> all items of "tack" and "any Rose Tree Hunt memorabilia" regardless of whether the items bear a "Rose Tree" brand or insignia. [Appellant] maintains that "any Rose Tree memorabilia" encompasses all items owned by [Testator] which have symbolic or actual references to foxes, fox hunting, horses, equestrian hobbies and the like because every such item served to remind [Testator] of the Rose Tree experiences he shared with [Appellant]. In addition, [Appellant] maintains that "tack" encompasses any item used or intended to be used by [Testator] with his horses in accordance [with the definition provided by Appellant's witness at the evidentiary hearing] and the dictionary definition of the word.

Appellant's brief at 8–9. Contrarily, the co-executors asserted that only items with a "Rose Tree" mark or insignia qualified

as "Rose Tree Hunt memorabilia." N.T. at 150.

¶ 16 In support of his expansive definitions of the terms at issue, Appellant presented the testimony of Joseph Murtagh, the Master of Fox Hounds [3] at the Rose Tree Fox Hunting Club as of the hearing date. *Id.* at 9, 13. Mr. Murtagh indicated that the term "Rose Tree Hunt memorabilia" would not be limited to marked items, but would include items not related to fox hunting that were owned by someone who was connected with the Rose Tree Hunt club. *Id.* at 28. For example, Mr. Murtagh testified that a weathervane with a horse on it would be Rose Tree memorabilia, not because there is a horse on it, but merely because Testator owned it while he was connected with the club. *Id.* at 27. Mr. Murtagh also testified that Rose Tree Hunt memorabilia included any horse, fox, or hound-related items. *Id.* at 31. He indicated that if an item were owned by Testator, who was at one time involved with the club, and if, for example, that item had the image of a horse or fox on it, he would characterize it as Rose Tree Hunt memorabilia. *Id.* at 32. He noted that the only fox hunting club that Testator had been involved with was Rose Tree. *Id.* at 16.

¶ 17 Appellant also testified at the hearing. Appellant explained how he and Testator were close friends for 40 years, how he taught Appellant to ride horses and fox hunt, and how they were both extensively involved with the Rose Tree Fox Hunting Club. He agreed with Mr. Murtagh's opinion that "the individual decides what his memorabilia is." *Id.* at 54. Appellant asserted that he and Testator "thought on the same wavelength," and would both consider "anything to do with horses,

---

**3.** The Master of Fox Hounds is responsible for the overall governance of the club. N.T. at 9. Testator had served as the Master of Fox Hounds at the club for two terms, first from 1971 to 1977, and again from 1979 to 1981. *Id.* at 35.

hounds, or foxes, fox hunting scenes, or anything like that" as "memorabilia." *Id.*

¶ 18 Appellant presented the court with numerous photographs of items that he received from the estate and items that were auctioned, but which he considered to be Rose Tree Hunt memorabilia. Some of the items given to him by the co-executors did not have "Rose Tree" markings, like some pictures, books about horses, and some fox statutes. *Id.* at 64–73; Plaintiff's Exh. J.[4] But other items did have such markings or were photographs or trophies associated with the club or its members. *Id.* Appellant also presented pictures of items he purchased at the auction, which he considered to be included in the bequest. *Id.* at 76. These items did not have a Rose Tree mark, but depicted various hunt scenes and images of foxes, horses, or hounds. *Id.* at 76–80; Plaintiff's Exh. J. With regard to a painting of a horse, Appellant contended that it constituted Rose Tree memorabilia because it "is a beautiful horse capable of fox hunting which [Testator] admired and got reasonably." N.T. at 80.

¶ 19 Appellant also presented pictures of items sold at the auction that he could not afford to purchase, but which he apparently considered to be Rose Tree Hunt memorabilia. *Id.* These items included such things as a chair made of horseshoes, a weathervane depicting a horse, a statuette with two boys sitting on a horse, and dinnerware depicting foxes or hunt scenes. *Id.* at 80–94; Plaintiff's Exh. J.[5] However, these items did not have a Rose Tree mark or insignia. *Id.* at 129–30. With regard to one item, Appellant reasoned that it constituted Rose Tree Hunt memorabilia on the

basis that "it showed a man walking through a field with a ... hound, and [Testator] owned it." *Id.* at 130. He reiterated his position that any item that Testator owned that had "anything to do with a horse or a fox or a fox head or a dog, or anything to do with fox hunting" constituted Rose Tree Hunt memorabilia. *Id.* at 130. He explained: "[T]hat's ... how [Testator] and I viewed it and that's what we collected. If it was a horse on it [sic], if there was a hound or a fox hound, of [sic] a hunt scene" it was Rose Tree memorabilia. *Id.* at 131. In other words, according to Appellant, and because Rose Tree was the only fox hunt club Appellant participated in, any item owned by Testator that reminded one of fox hunting constituted Rose Tree Hunt memorabilia. *Id.* at 132.

¶ 20 Appellant also prepared lists of items that he thought were Rose Tree memorabilia such as boot tops, painted dishes, cast iron foxes, and a picnic basket. *Id.* at 96. With regard to the picnic basket, he contended that it constituted Rose Tree Hunt memorabilia because it "was part of the carriage hill top and we had a display at the York Historical Society with our carriages and that was a necessary part of the tack to show those carriages, tailgating." *Id.*

¶ 21 In sum, Appellant testified that the contested items described above constituted Rose Tree Hunt memorabilia because:

[A]n individual's hunt memorabilia is an individual's hunt memorabilia. And depending on the individual, if that reminds you of fox hunting—when we see a fox, if it's on a knife or a glass or we

---

4. Co-executor Wilton testified that these unmarked items were of very little value, so instead of throwing them out, he offered them to Appellant. N.T. at 160.

5. This grouping also included the sleigh bells that were sold at action for $143.75, but which the court later determined constituted "tack," resulting in the above-mentioned amendment to the First and Final Account.

see a fox hound or we see a horse, that immediately takes us into fox hunting, Rose Tree, steeple chases, hound shows, hunt meets, the scenes of fox hunting which remind us of . . . our experiences. So they are memorabilia or things which remind us of things we enjoy doing. *Id.* at 103–104. In further support of his position, Appellant testified that he was "part of [Testator's] life" while Testator collected many of these items, that they collected at the same time, that they purchased items together, and that the only hunt club they participated in was Rose Tree. *Id.* at 104.

¶ 22 With regard to the meaning of "tack," Appellant asserted that tack includes items used on the horse for riding or driving, items in the tack room supporting the horse, or items in a tack room or room near the barn where hunting coats, boot scrapers, and other materials are kept. *Id.* at 87. Similarly, Mr. Murtagh defined tack as "anything associated with the equipment for the horses, whether it be riding or carriage or trial riding or fox hunting[.]" *Id.* at 20.

¶ 23 In support of their opposing position, the co-executors presented the testimony of John McClain, the president of York Town Auction, Inc., who managed the estate sale in this case. *Id.* at 169–70. Upon questioning from the court, Mr. McClain testified that he would not consider, for example, an antique lithograph or painting of people fox hunting to be memorabilia of a particular fox hunt club, unless it was so marked. *Id.* at 179. For example, if an unmarked lithograph of a fox hunt hung in a particular hunt club's tap room for years, Mr. McClain would not consider that to be memorabilia of that particular hunt club *per se. Id.* at 180–81. Indeed, through his experience with antique items, he indicated that thousands of similar unmarked lithographs or pictures, depicting fox hunt scenes and the like, existed, and could not be objectively linked to any particular hunt club.

¶ 24 The day after receiving the above testimony, Judge Snyder concluded, contrary to Appellant's expansive position, that "Rose Tree Hunt memorabilia" included only those items that had an "obvious and objective connection with Rose Tree Hunt." *Id.* at 211. Judge Snyder stated, "[i]f [Testator] had meant any items that had an obvious and objective connection with fox hunting or hounds or horses, he would have said it." *Id.* Instead, Testator specified "Rose Tree Hunt" memorabilia, and the court construed that to mean only items "that objectively would call to mind Rose Tree Hunt" as opposed to more general categories of fox hunting, hounds, or horses. *Id.* at 211.

¶ 25 In other words, the court adopted a definition of the disputed terms that represented a "middle-ground" between the parties' proffered definitions. The court included items overtly marked with a "Rose Tree" inscription or insignia in the definition of "Rose Tree Hunt memorabilia." However, the court also inquired into certain unmarked items to determine if they bore an objective connection to the Rose Tree club specifically.

¶ 26 For example, to establish an objective connection between certain unmarked items and the Rose Tree Fox Hunting Club, Appellant presented, at the evidentiary hearing, an inventory list acquired from the Rose Tree Fox Hunting Club, dated February 19, 1964. *Id.* at 189. Items on the list included such things as antique pottery and art with fox hunting themes. Plaintiff's Exh. O. Appellant asserted that a number of unmarked pictures sold at York Town Auction from Testator's estate were once owned by Rose Tree Fox Hunting Club, as evidenced by this list. *Id.* at 190.

¶ 27 Included on the list was a notation of "5 Water Colors" representing five previous Rose Tree Masters of Fox Hounds, listed by name. Plaintiff's Exh. O. Appellant asserted that five unmarked watercolor portraits of men on horseback, sold at the auction, were the former Rose Tree Masters of Fox Hounds noted on the inventory list. *Id.* at 91–92. The court inquired specifically with regard to these portraits to determine if Appellant could satisfactorily establish an objective connection between the watercolors noted on the list and the unmarked portraits. Thus, it appears that the court would have considered these portraits to be Rose Tree Hunt memorabilia if Appellant could establish the objective connection to that particular club, as required by the plain language of the will.

¶ 28 However, upon further questioning by the court, Appellant conceded that he could not be sure whether the watercolors depicted the former Masters of, specifically, Rose Tree Fox Hunting Club. *Id.* at 216. Additionally, as noted above, Mr. McClain informed the court that there existed thousands of prints and lithographs with similar fox hunting themes, like the unmarked ones sold at the auction, which Appellant purported corresponded to the 1964 list. Accordingly, the court, whose findings we accord the same weight as those of a jury, had ample evidence upon which to conclude that Appellant failed to establish that certain unmarked items bore an objective connection to the Rose Tree club, specifically, as opposed to any other fox hunting club. Similarly, the court did not err by refusing to ascribe an expansive definition of "Rose Tree Hunt memorabilia" to include anything even remotely related to the general themes of fox hunting, hounds, horses, and the like.

¶ 29 Finally, we further conclude that the court did not abuse its discretion by determining that "tack," means "horse gear," which definition comported with that proffered by Appellant's witness, Mr. Murtagh. As mentioned above, the court determined that the sleigh bells, to be fitted on horses, constituted "tack" and were therefore properly included in the bequest to Appellant.

¶ 30 In sum, we conclude that Judge Snyder's findings and conclusions are well-supported by the record, and that he did not predicate his conclusions upon a capricious disbelief of competent and credible evidence. *See Elkins,* 888 A.2d at 823. Judge Snyder did not abuse his discretion or commit an error of law by rejecting Appellant's expansive definitions of the terms at issue and by concluding that there were no objective indications that the terms of Item II were subject to differing meanings. Accordingly, we affirm the January 25, 2006 order of the Orphans' Court Division of the Court of Common Pleas of York County confirming the First and Final Account.

¶ 31 Order affirmed.