689 A.2d 939

**In re ESTATE OF Harry W. HARRISON, Deceased.**

**Appeal of Harry Alexander STROBEL, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 12, 1996.

Filed Feb. 11, 1997.

116

John A. Terrill, II, W. Conshohocken, for appellant.

James R. Ledwith, Philadelphia, for Sharples, participating party.

Before KELLY, SAYLOR and MONTEMURO *, JJ.

KELLY, Judge:

In this appeal we are asked to determine whether the trial court properly upheld the distribution of trust income to the testator's grandchildren on a per capita basis or whether the testator intended per stirpes distribution based upon the language the testator chose to employ in a lawyer-drawn will. Because we hold that the testator intended per stirpes distribution, we reverse the trial court's decree and remand for proceedings consistent with this opinion.

The pertinent facts and procedural history underlying this appeal may be summarized as follows. Harry W. Harrison, Sr. (hereinafter "decedent") died on January 25, 1968, leaving his Last Will and Testament dated February 27, 1959. The decedent was survived by two sons, Harry W. Harrison, Jr. and Roberts Harrison.

Under Article NINTH of his Will, the decedent created two trusts by exercising his powers of appointment over four separate trusts, known as the "Harrison Family Trusts," created by his parents, Charles C. Harrison and Ellen Waln Harrison. The decedent's exercise of his powers of appointment over his share of the income of the Family Trusts is set forth in Paragraph A of Article NINTH of his Will and was effective for twenty-one (21) years from the decedent's death on January 25, 1968, until the termination of the Family Trusts on January 25, 1989. During this period, the decedent's share of the income previously paid to the decedent from the Family Trusts was to be divided into two equal shares for the decedent's sons, Harry W. Harrison, Jr. and Roberts Harrison, and their respective issue, if any. As to each of the two shares of income, after the payment of certain

* Retired Justice assigned to the Superior Court.

specified sums to the "children" of his sons or "the issue of a deceased child," the balance of each share of this income was to be paid to such son during his life and, upon his death, to his "issue," if any, surviving him, in equal shares per stirpes, upon the principle of representation, or, in default of such issue, added to the other one-half (1/2) share for the decedent's other son or his issue, if any.[1]

The decedent's exercise of his powers of appointment over his share of the principal of the Harrison Family Trusts is set forth in Paragraph B of Article NINTH of his Will and created the trust at issue in this case (hereinafter "trust"). In pertinent part, Paragraph B of Article NINTH provides as follows:

> Until twenty-one (21) years after the death of the last survivor of the issue of my said father and mother who were alive on the date of the execution of the earliest of said Deeds of Trust, Trustees shall pay the net income in such periodic installments as may be convenient, but not less frequently than quarterly, to the issue of my sons, HARRY W. HARRISON, JR. and ROBERTS HARRISON, living on such periodic distribution dates, in equal shares per stirpes, upon the principle of representation.

(R.R. 11a–12a).[2]

The Harrison Family Trusts terminated on January 25, 1989. Pursuant to the terms of the decedent's Will, it appears that the trust interests of the decedent's sons were to have terminated on that date and that the trustees were directed to hold the principal in a single trust. A dispute between the decedent's two sons arose regarding when their respective interests were to have terminated, however, resulting in negotiations and eventually an agreement that the trustees would continue to pay the income from the principal in the same fashion as they had been prior to the termination of the Harrison Family Trusts.

---

1. Paragraph A of Article NINTH is reprinted in full in Appendix A at 946–948.

2. Paragraph B of Article NINTH is reprinted in full in Appendix B at 948.

Upon Roberts Harrison's death on April 8, 1990, income distributions to the decedent's sons were discontinued according to the terms of the agreement. Thereafter, the income from the separate trust account for the benefit of the Roberts Harrison family and from the separate trust account for the benefit of the Harry W. Harrison, Jr. family was paid in equal shares to, or escrowed for, the children of Roberts Harrison. Roberts Harrison was survived by two daughters, Jean Hyland and Sally Sharples, who in turn have children. It was the trustees' position that Harry W. Harrison, Jr., still living, had no issue.

While preparing the First Account of the trust under Article NINTH of the decedent's Will, the trustees became aware of an inter vivos trust established by Harry W. Harrison, Jr. which designated Harry A. Strobel as life tenant and remainderman. Therefore, the trustees sent an audit notice dated May 6, 1993, to Mr. Strobel explaining that the trustees had presented their First Account of the trust to the clerk of the Orphans' Court of Delaware County. In that notice the trustees explained, *inter alia*, that the Account would be called for audit before the court in the near future and that it was the trustees' position that Harry W. Harrison, Jr. had no issue and, therefore, that Mr. Strobel had no interest in the trust. Mr. Strobel filed timely objections to the trustees' position, asserting that he was the natural son of Harry W. Harrison, Jr., born out of wedlock, that he was a descendant of the creators of the Harrison Family Trusts and issue of Harry W. Harrison, Jr. and, accordingly, that he was entitled to certain distributions of trust income under the terms of the Will.[3]

On May 24, 1995, the Honorable A. Leo Sereni presided over the hearing on Mr. Strobel's objections and subsequently filed the adjudication dated June 5, 1995, as amended June 20, 1995. Judge Sereni found by clear and convincing evidence that Mr. Strobel was the natural child of Harry W. Harrison, Jr. and that Mr. Strobel was therefore legally entitled to a

---

3. The relevant portion of the Harrison family tree is reproduced in Appendix C at 949.

share of the trust income. Judge Sereni also determined that based upon the language of Paragraph B of Article NINTH, it was the clear intention of the decedent that the decedent's grandchildren should take in equal shares and that the "per stirpes" distribution should begin with the issue of a deceased grandchild. (Orphans' Court Opinion, filed 1/19/96, at 3). Therefore, the court held that Mr. Strobel was entitled to a one-third (1/3) share of the income from the trust.

Mr. Strobel filed a timely exception to Judge Sereni's adjudication limited to the issue of whether Mr. Strobel was entitled to a one-half (1/2) share under the terms of the Will, and Judge Sereni heard oral argument on September 13, 1995. In an opinion and final decree filed on January 19, 1996, Judge Sereni denied Mr. Strobel's exception and affirmed the adjudication. On February 15, 1996, Mr. Strobel filed this timely appeal.

On appeal, Mr. Strobel poses the following question for our review:

> WHEN A DECEDENT IN HIS WILL PROVIDES IN-COME "TO THE ISSUE OF MY SONS, [X AND Y, NAMING THEM], LIVING ON SUCH PERIODIC DISTRIBUTION DATES, IN EQUAL SHARES, PER STIRPES, UPON THE PRINCIPLE OF REPRESENTATION" SHOULD INCOME BE INITIALLY DIVIDED INTO HALVES BETWEEN THE TWO SONS' FAMILIES OR INTO THIRDS AMONG THE THREE GRANDCHILDREN'S FAMILIES?

(Mr. Strobel's Brief at 4).

Preliminarily, we are guided by the following principles:

> The findings of a judge of the orphans' court division, sitting without a jury, must be accorded the same weight and effect as the verdict of a jury, and will not be reversed by an appellate court in the absence of an abuse of discretion or a lack of evidentiary support. *In re Estate of Cornell,* 336 Pa.Super. 594, [597], 486 A.2d 424, 425 (1984).

This rule is particularly applicable "to findings of fact which are predicated upon the credibility of the witnesses, whom the judge has had the opportunity to hear and observe, and upon the weight given to their testimony." *Herwood v. Herwood,* 461 Pa. 322, 336 A.2d 306 (1975). In reviewing the Orphans' Court's findings, our task is to ensure that the record is free from legal error and to determine if the Orphans' Court's findings are supported by competent and adequate evidence and are not predicated upon capricious disbelief of competent and credible evidence. *In re: Estate of Damario,* 488 Pa. 434, 412 A.2d 842 (1980). However, we are not limited when we review the legal conclusions that Orphans' Court has derived from those facts. *In re: [Testamentary Trust Created Under Last Will and Testament of] Ischy Trust,* 490 Pa. 71, 415 A.2d 37 (1980).

*In re Estate of Dembiec,* 321 Pa.Super. 515, 519–520, 468 A.2d 1107, 1110 (1983).

*Estate of Gilbert,* 342 Pa.Super. 82, 87–88, 492 A.2d 401, 404 (1985).

*In re Estate of Inter,* 444 Pa.Super. 417, 421, 664 A.2d 142, 144–45 (1995).

■ The testator's intent is the polestar in the construction of every will and that intent, if it is not unlawful, must prevail. *Estate of Pew,* 440 Pa.Super. 195, 220, 655 A.2d 521, 533 (1994) (quoting *In re Estate of Walton,* 409 Pa. 225, 231, 186 A.2d 32, 35 (1962)); *In re Deed of Trust of McCargo,* 438 Pa.Super. 570, 577, 652 A.2d 1330, 1333 (1994), *allocatur denied,* 543 Pa. 693, 670 A.2d 141 (1995)(quoting *Estate of Felice,* 487 Pa. 342, 351–52, 409 A.2d 382, 386–88 (1979)).

In order to ascertain the testamentary intent, a court must focus first and foremost on the precise wording of the will, and if ambiguity exists, on the circumstances under which the will was executed, only if the testator's intent remains uncertain may a court then resort to the general rules of construction. *In re Estate of Tashjian,* 375 Pa.Super. 221, 226, 227, 544 A.2d 67, 70 (1988). The words of a will are not

to be viewed in a vacuum but rather as part of an overall testamentary plan. *In re Estate of Ogden,* 353 Pa.Super. 273, 276, 509 A.2d 1271, 1273 (1986).

*In re Estate of Weaver,* 392 Pa.Super. 312, 326, 572 A.2d 1249, 1256 (1990), *allocatur denied,* 525 Pa. 657, 659, 582 A.2d 324, 325 (1990). *Accord Estate of Pew, supra* at 220–21, 655 A.2d at 533–34.

■ When interpreting a will, we must give effect to every word and clause where reasonably possible so as not to render any provision nugatory or mere surplusage. *Estate of Rush,* 426 Pa.Super. 119, 123, 626 A.2d 602, 604 (1993) (citations omitted). *See also In re Estate of England,* 414 Pa. 115, 119, 200 A.2d 897, 899 (1964) (citations omitted); *In re Deed of Trust of McCargo, supra* at 584, 652 A.2d at 1337. Further, technical words must ordinarily be given their common legal effect as it is presumed these words were intentionally and intelligently employed, especially where they are used by someone learned in probate law. *In re Estate of Grier,* 403 Pa. 517, 525, 170 A.2d 545, 549 (1961)(quoting *In re Estate of Baldwin,* 377 Pa. 268, 273, 105 A.2d 52, 54 (1954)); *In re Estate of Dex,* 408 Pa.Super. 391, 395, 596 A.2d 1143, 1145 (1991)(citing *In re Estate of MacFarlane,* 313 Pa.Super. 397, 401, 459 A.2d 1289, 1291 (1983)). *See also In re Deed of Trust of McCargo, supra* at 583, 652 A.2d at 1336.

■■ "Courts are not permitted to determine what they think the testator might or would have desired under the existing circumstances, or even what they think the testator meant to say." *In re Estate of Dex, supra* (citing *In re Estate of Baker,* 495 Pa. 522, 523, 434 A.2d 1213, 1214 (1981)); *In re Estate of MacFarlane, supra* (citations omitted). Rather, the court must focus on the meaning of the testator's words within the four corners of the will. *In re Estate of Dex, supra; In re Estate of MacFarlane, supra.* Finally, a court may not rewrite an unambiguous will. *In re Estate of Kelly,* 473 Pa. 48, 55, 373 A.2d 744, 748 (1977)(quoting *In re Estate of Reinheimer,* 265 Pa. 185, 108 A. 412 (1919); *In re Estate of Thomas,* 457 Pa. 546, 551, 327 A.2d 31, 34 (1974)). Our initial

focus, therefore, is the language which the decedent employed in Article NINTH B.1 to manifest his intended scheme of distribution of the trust income: "to the issue of my sons, HARRY W. HARRISON, JR. and ROBERTS HARRISON, living on such periodic distribution dates, in equal shares per stirpes, upon the principle of representation."

■ Appellees assert that by these words the decedent intended the trust income to be divided per capita among the decedent's grandchildren, with a deceased grandchild's share distributed to his or her issue per stirpes. Conversely, Mr. Strobel argues that this language reveals the decedent's intent to distribute the income per stirpes to the issue of his named children based on an equal division of the shares at his two sons' level. We agree with Mr. Strobel.

■■ When used in its common legal or technical sense, "issue" is a multigenerational term meaning all succeeding generations. *See In re Deed of Trust of McCargo, supra* at 578, 652 A.2d at 1334; Restatement (Second) of Property (Donative Transfers) § 25.9. It is well settled that where the word "issue" is not clarified in the context of the testamentary document, children do not take concurrently or per capita with their parents, but take per stirpes. *In re Estate of Flagg,* 501 Pa. 38, 45, 459 A.2d 740, 743 (1983)(quoting *In re Estate of Mayhew,* 307 Pa. 84, 91–92, 160 A. 724, 726–27 (1932)); *In re Estate of Grimm,* 442 Pa. 127, 144, 275 A.2d 349, 357–58 (1971)(quoting same). *See also In re Estate of Wanamaker,* 399 Pa. 274, 159 A.2d 201 (1960)(stating "heirs" implies representation).

Appellees proffer that the decedent used "issue" in the narrow sense to mean only the immediately following generation, or grandchildren. In support of their claim, appellees rely upon this Court's conclusion in *In re Deed of Trust of McCargo,* 438 Pa.Super. 570, 652 A.2d 1330 (1994) that where the settlor used the term "issue," he intended equal distribution among his grandchildren, with the issue of a deceased

grandchild to take his or her share, per stirpes.[4] Appellees' reliance is misplaced, however, as our reasoning in *Deed of Trust of McCargo, supra,* is inapposite to the matter at hand. In that case, our Court could not discern the meaning of "issue" as the term was used in the settlor's trust agreement by relying solely on the language of the document itself. Even though a scrivener prepared the McCargo trust agreement, the words "issue" and "children" were used interchangeably and resulted in an "intrinsic dichotomy" within the agreement. *Id.* at 579, 652 A.2d at 1334. Because we were confronted by a "manifestly ambiguous document," the Court was compelled to look at extrinsic evidence in order to determine the settlor's intent. *Id.* at 580, 652 A.2d at 1335. Based upon language utilized in his will, we were able to discern the intended distribution that McCargo as settlor had failed to make clear but McCargo as testator "made abundantly obvious." *Id.* at 582, 652 A.2d at 1336.

In the matter *sub judice,* appellees do not argue that the language is ambiguous or point to any extrinsic evidence in support of their assertion that the term "issue" should be construed in a narrow sense. Appellees do point to the Restatement (Second) of Property for the proposition that inexpert use of technical language may be evidenced by the interchangeable use of the words "issue" and "children," thereby justifying the conclusion that only the first generation below the designated person(s) is entitled to the distribution. Restatement (Second) of Property (Donative Transfers) § 25.9, comment d. Appellees fail to cite, however, where the decedent used these terms interchangeably. Based upon our reading of the decedent's Will, we conclude that there is no ambiguity in the language employed and, thus, find no need to look outside of the document to narrow the common legal interpretation of the term "issue."

4. The language that was subject to interpretation in *Deed of Trust of McCargo, supra,* was "the trust shall thereafter continue for a period of twenty-one (21) years for the benefit of the lawful issue of all of my said children, and the income therefrom shall be paid to them in convenient installments, at least quarterly, per capita and not per stirpes." *Id.* at 575, 652 A.2d at 1332.

In addition, other cases that appellees rely upon in support of their position are equally unavailing because the language employed in the respective testamentary document in each of those cases is readily distinguishable from the language utilized in the case before us. *See e.g. In re Estate of Abele,* 416 Pa. 212, 205 A.2d 861 (1965)(holding testator's words "unto such of the *children* and *issue of deceased children* of my said brothers and sisters as may be living at the time fixed for the said distribution, equally, absolutely, per stirpes" required per capita distribution to nieces and nephews and per stirpes distribution to issue of deceased nieces and nephews); *In re Estate of England,* 414 Pa. 115, 200 A.2d 897 (1964) (holding testator intended per capita distribution among grandchildren and per stirpes distribution among issue of deceased grandchildren by utilizing the words "equally amongst the *children* of my children, who shall then be living, and the *issue of such of them as may be deceased,* per stirpes, absolutely and in fee"); *In re Estate of Rosengarten,* 349 Pa. 32, 36 A.2d 310 (1944)(holding testator intended per capita distribution to grandchildren by stating "to my grandchild or *grandchildren* or their issue living at that time, *such issue taking the share their parent would have taken* if living").

Appellees contend that Mr. Strobel's interpretation of the disputed provision requires the phrasing "to *my* issue living on such periodic distribution dates, per stirpes, upon the principle of representation." (Appellees' Brief at 8). Appellees claim that Mr. Strobel's interpretation negates the effect of the words "issue of my sons, HARRY W. HARRISON, JR. and ROBERTS HARRISON" and "in equal shares." (*Id.*). The decedent therefore intended, according to appellees, the words "per stirpes, upon the principle of representation" to refer only to gifts to the living issue of a deceased grandchild. We cannot agree.[5]

5. Contrary to appellees' suggestion, the phrasing "to my issue" in the context of this case would result in distribution of one-half of the income to Harry W. Harrison, Jr., a result the decedent also did not intend.

 It is well settled in this Commonwealth that the expression "per stirpes" may be used in two different contexts; it may refer to either a "taking by right of representation" or to a taking "collectively by families and not equally as individuals." *In re Estate of Grimm, supra* at 143–44, 275 A.2d at 357 (quoting *In re Estate of Corr,* 338 Pa. 337, 341–42, 12 A.2d 76, 79 (1940), citing *In re Estate of Hogg,* 329 Pa. 163, 196 A. 503 (1938)). The effect of an interpretation that a testator intended the latter is not altered by the direction to divide the distribution in "equal shares" as these words are no less appropriate to a division among classes than to division among individuals. *In re Estate of Wanamaker, supra* at 283, 159 A.2d at 205. *See also In re Estate of Hoover,* 417 Pa. 263, 207 A.2d 840 (1965)(interpreting "share and share alike"). It is also well settled that the "words 'upon the principle of representation' clearly refer to a stirpital scheme of distribution." *In re Estate of Flagg, supra* at 44, 459 A.2d at 743.

 Appellees argue that decedent's intended distribution is as follows: to my grandchildren living on such periodic distribution dates, in equal shares, and to the issue of a deceased grandchild per stirpes, upon the principle of representation. We do not discern this intent from the words the decedent chose to employ. Nowhere in Article NINTH B of his Will does the decedent refer to his grandchildren as a discrete class. "When he came to make a provision for the descendants of his children he could have provided a per capita distribution for his grandchildren, if he so desired," but the decedent chose not to do so in Article NINTH B. *See In re Estate of Marshall,* 377 Pa. 41, 44, 103 A.2d 420, 422 (1954) (citations omitted). *See also In re Estate of Grimm, supra* at 144–46, 275 A.2d 357–59 (discussing *In re Estate of Wanamaker, supra; In re Estate of Marshall, supra* ). "A court has no right to create equality among grandchildren even if we think that is desirable, unless the [testator] clearly intended to create equality among all [his] grandchildren, and this [he] failed to do." *Estate of Houston,* 491 Pa. 339, 350, 421 A.2d 166, 172 (1980)(quoting *In re Estate of Henderson,* 405 Pa. 451, 456, 176 A.2d 428, 430 (1962)). *See also In re Estate of*

*Hoover,* 417 Pa. 263, 207 A.2d 840 (1965) (explaining court cannot rewrite testamentary document in order to create what some think is fairer or more equitable distribution); *Estate of Mills,* 352 Pa.Super. 222, 507 A.2d 853 (1986) (same).

It is apparent that the decedent knew how to specifically designate the children of his sons and the issue of a deceased child where the decedent intended to make such a class designation.[6] Our interpretation of Article NINTH B.1 also comports with the decedent's overall testamentary plan. *See In re Estate of Weaver, supra* (citing *In re Estate of Ogden, supra* ). For example, in Article NINTH A the decedent divided the trust income into two equal shares, one for the benefit of the Roberts Harrison family and one for the benefit for the Harry W. Harrison, Jr. family.[7]

Appellees' claim that the decedent's instructions in Article ELEVENTH B.1 supports their contention that Article NINTH B.1 requires per capita distribution to the grandchildren must also fail. In Article ELEVENTH, the decedent transferred any residue remaining into a long-term trust that does not terminate until twenty-one (21) years after the death of the last of decedent's beneficiaries living at decedent's death. Under Paragraph B, distribution of the principal is to be paid "to my issue then living, in equal shares, per stirpes." [8] In Article ELEVENTH B, unlike in Article NINTH B, the decedent purposefully chose not to designate the heads to be used in distribution. Accordingly, the stirpes would begin at the oldest generation or class having living members with a beneficial interest, long after decedent's sons and grandchildren have died. That the decedent's directions in one article for distribution at a distant point in the future when all of his

---

6. In Article NINTH A, the decedent divided the income previously paid to the decedent from the Harrison Family Trusts into two equal shares, one for each of his named sons and directed payment to the "children" of each son as well as to "the issue of a deceased child." *See* Appendix A, *infra* at 946–948. In Article ELEVENTH, the decedent properly designated "sons" and "children and issue of my said sons." *See* Appendix D, *infra* at 950.

7. *See* Appendix A, *infra* at 946–948.

8. Article ELEVENTH is reprinted in full in Appendix D at 950.

then living beneficiaries would be dead is different from his directions in two articles when it was quite likely his sons would be alive does not support appellees' contention that we should read into Article NINTH B.1 something other than what the Article already says in unambiguous language.

We hold that the decedent's intention according to the language decedent employed in his Will, and specifically Article NINTH B.1, was to distribute the trust income per stirpes, with his two sons as the heads of the stirpes. Thus, each son's issue were to receive an equal share by family and not equal among the grandchildren themselves. Therefore, we conclude that the issue of Roberts Harrison are entitled to a one-half share and the issue of Harry W. Harrison, Jr. are entitled to the other one-half share of the trust income under the terms of the decedent's Will.

Based upon the foregoing analysis, we hold that the trial court erred by deciding that Mr. Strobel was entitled to a one-third share rather than one-half of the trust income under the terms of the decedent's Will. Accordingly, we reverse the January 19, 1996 decree and remand the case for proceedings consistent with this opinion.

Decree reversed; case remanded. Jurisdiction is relinquished.

### APPENDIX A

### N I N T H

Under certain Deeds of Trust executed by my father, the late Charles C. Harrison, and my mother, the late Ellen Waln Harrison, I am given certain powers of appointment, with limitation to my own descendants, and otherwise, as in the respective instruments will appear.

A. In the exercise of the powers so conferred upon me, I appoint the income over which I may have power of testamentary disposition under the said Deeds of Trust executed by my father and mother to my Trustees hereinafter named, IN TRUST, NEVERTHELESS, to distribute the same in such periodic installments as may be

convenient, but not less frequently than quarterly, among the following of my descendants who shall be living on such periodic distribution dates:

1. From one-half (1/2) of such income, Trustees shall:

(a) During the lifetime of my son, Harry W. Harrison, Jr.:

(1) Pay to each of his children the sum of Five Thousand Dollars ($5,000.00) annually during the period such child is under the age of eighteen (18) years, the sum of Seven Thousand Five Hundred Dollars ($7,500.00) annually during the period such child shall be between the ages of eighteen (18) and twenty-one (21) years, the sum of Ten Thousand Dollars ($10,000.00) annually so long as such child shall be between the ages of twenty-one (21) and twenty-five (25) years, and the sum of Fifteen Thousand Dollars ($15,000.00) annually during the period such child is over the age of twenty-five (25) years.

(2) Pay to the issue of a deceased child, in equal shares per stirpes, upon the principle of representation, the aggregate sum of Ten Thousand Dollars ($10,-000.00) annually, regardless of the age of any of such issue.

(3) Pay to my son the balance, if any, of the said one-half (1/2) of such income.

(4) In the event that the said one-half (1/2) of such income is insufficient to pay the fixed amounts hereinabove provided in sub-paragraphs (1) and (2), the payments thereunder shall abate pro rata among all beneficiaries entitled to receive such payments fixed in amount.

(b) Upon the death of my said son if he shall survive me or upon my death if my said son shall not survive me:

(1) Pay the entire one-half (1/2) of such income to the issue, if any, of my said son who shall survive him or me, in equal shares per stirpes, upon the principle of representation.

(2) If my said son shall leave no issue so surviving at the time of his or my death, the entire one-half (1/2) of such income shall be added to the other one-half (1/2) of the income for which provision is hereinafter made in the next succeeding sub-paragraph 2.

2. From the other one-half (1/2) of such income, Trustees shall:

(a) During the lifetime of my son, ROBERTS HARRISON:

(1) Pay to each of his children the sum of Five Thousand Dollars ($5,000.00) annually during the period such child is under the age of eighteen (18) years, the sum of Seven Thousand Five Hundred Dollars ($7,500.00) annually during the period such child shall be between the ages of eighteen (18) and twenty-one (21) years, the sum of Ten Thousand Dollars ($10,000.00) annually so long as such child shall be between the ages of twenty-one (21) and twenty-five (25) years, and the sum of Fifteen Thousand Dollars ($15,000.00) annually during the period such child is over the age of twenty-five (25) years.

(2) Pay to the issue of a deceased child, in equal shares per stirpes, upon the principle of representation, the aggregate sum of Ten Thousand Dollars ($10,-000.00) annually, regardless of the age of any of such issue.

(3) Pay to my son the balance, if any, of the said one-half (1/2) of such income.

(4) In the event that the said one-half (1/2) of such income is insufficient to pay the fixed amounts hereinabove provided in sub-paragraphs (1) and (2), the payments thereunder shall abate pro rata among all beneficiaries entitled to receive such payments fixed in amount.

(b) Upon the death of my said son if he shall survive me or upon my death if my said son shall not survive me:

(1) Pay the entire one-half (1/2) of such income to the issue, if any, of my said son who shall survive him and me, in equal shares per stirpes, upon the principle of representation.

(2) If my said son shall leave no issue so surviving at the time of his or my death, the entire one-half (1/2) of such income shall be added to the other one-half (1/2) of the income for which provision is hereinabove made in the next preceding sub-paragraph 1.

(R.R. 6a–11a).

## APPENDIX B

### N I N T H

B. In the exercise of the powers so conferred upon me, I appoint the principal over which I may have power of testamentary disposition under the said Deeds of Trust executed by my father and mother to my Trustees hereinafter named, IN TRUST, NEVERTHELESS, to invest and reinvest the same, collect the income and distribute the net income and principal, as follows:

1. Until twenty-one (21) years after the death of the last survivor of the issue of my said father and mother who were alive on the date of the execution of the earliest of said Deeds of Trust, Trustees shall pay the net income in such periodic installments as may be convenient, but not less frequently than quarterly, to the issue of my sons, HARRY W. HARRISON, JR. and ROBERTS HARRISON, living on such periodic distribution dates, in equal shares per stirpes, upon the principle of representation.

2. Upon the expiration of twenty-one (21) years after the death of the last survivor of the issue of my said father and mother who were alive on the date of the execution of the earliest of said Deeds of Trust, Trustees shall distribute the principal to and among the issue then living of my said sons, in equal shares per stirpes, upon the principle of representation, or in default of such

132

issue, to the issue then living of my father and mother, in equal shares per stirpes, upon the principle of representation.

(R.R. 11a–13a).

### APPENDIX D

### E L E V E N T H

All the rest, residue and remainder of my estate, real and personal, I give, devise and bequeath to my Trustees, IN TRUST, NEVERTHELESS, to hold, invest and reinvest the same and to distribute the principal and net income thereof, as follows:

A. The net income shall be paid in quarterly installments to any of the group consisting of my wife, AMY BATHGATE HARRISON, my sons, HARRY W. HARRISON, JR. and ROBERTS HARRISON, the spouses or wives of my said sons, and the children and issue of my said sons, and of the survivors of them or any of them, living at the time of each such income distribution, in such amounts, shares and proportions and including or excluding any of said group, as Trustees (excluding any Trustee who is a member of said group and eligible for any such payment) may, in their sole and absolute discretion, see fit. I suggest, but do not direct, that Trustees in exercising their discretion, shall bear in mind the other means and sources of income which may be available to each of the said group, particularly, but not limited to, any sum or sums being paid among said group by virtue of the provisions of a certain Trust Agreement entered into this date between me, as Settlor, and Roberts Harrison, Daniel Lowenthal, and Fidelity–Philadelphia Trust Company, as Trustees, and that Trustees shall pay to my wife such portion of the net income as, after taking into consideration all factors, will insure the proper welfare, comfort, maintenance and support of my wife in the style to which I have accustomed her, and Trustees shall be liberal in

construing this provision, bearing in mind that it is my primary desire properly to provide for my wife.

B. Upon the expiration of twenty-one (21) years after the death of the last survivor of my wife, my sons, the spouses or widows of my sons and the issue of my sons who shall be living on the date of my death, or at such earlier time as there shall be no person alive entitled to receive income under the provisions of the preceding sub-paragraph A:

1. *Trustees shall pay the principal of this trust to my issue then living, in equal shares per stirpes, upon the principle of representation,* absolutely; or

2. In the event that there is no person alive to take under the provisions of the preceding sub-paragraph 1, Trustees shall pay the principal to THE MUSEUM OF THE UNIVERSITY OF PENNSYLVANIA, in which my father had such a deep interest.

(R.R. 15a–17a) (emphasis added).