## In re Educational Trust for the Benefit of Chambers

C.P. of Philadelphia County, O.C. No. 169 IC of 2005

*Eric L. Winkle*, for appellant.

*Kimberly J. Scott*, for participant Wells Fargo Bank, N.A.

*Miles H. Shore*, for participant School District of Philadelphia.

CARRAFIELLO, *J.*, Aug. 19, 2014—Ronald Chambers and Leslie Chambers, (hereinafter referred to as "appellants"), appeal the trial court's adjudication dated April 28, 2014 of the first and final account of the Ferren Chambers Educational Trust as stated by appellee Wells Fargo Bank, N.A., the appellants' objections, and the objections of appellee School District of Philadelphia.

Appellants also appeal the trial court's decree of the same date disposing of the same issues raised in appellants' petition for declaratory judgment.

By *Per Curiam* order, the Superior Court consolidated both appeals.[1]

## Facts and Procedural History

Appellants are the settlors and co-trustees with appellee, Wells Fargo Bank, N.A., (hereinafter referred to as "Wells Fargo"), of the educational trust for the benefit of Ferren Chambers, as well as her parents and the guardians of her person and estate.[2]

On April 2, 2004, special education hearing officer Rosemary E. Mullaly, following a due process hearing, issued her order finding that appellee, the School District of Philadelphia, owed Ferren Chambers, (hereinafter referred to as "Ferren"), 3,180 hours of compensatory education based upon two and one-half years of denial of a Free and appropriate public education.[3]

The resultant remedy was the creation of the educational trust for the Benefit of Ferren Chambers under agreement of trust dated January 10, 2005, (hereinafter referred to as the "trust")[4]. Appellants and appellee Wells Fargo Bank, N.A. (formerly Wachovia Bank, N.A.) were appointed co-trustees.

---

1. *Per Curiam* order filed 7/31/14, *In Re: Educational Trust for the Benefit of Ferren Chambers*, No. 1547 and 1548 EDA 2014.

2. Decree of the honorable Anne Lazarus dated April 2, 2004 adjudicated Ferren Chambers incapacitated and appointed appellants guardians of her person and estate.

3. Special education hearing officer decision dated April 2, 2004 (hereinafter referred to as the "Mullaly order"), exhibit A-1/P-1, Addendum.

4. Educational trust for the benefit of Ferren Chambers, exhibit A-1/P-1. The trial court notes that exhibit A-1/P-1 is a fully executed copy of the trust and was offered as the joint exhibit of appellants chambers and appellee Wells Fargo. Wells Fargo, as the accountant, designated its exhibits beginning with the letter "A". Appellants' exhibits are designated beginning with the letter "C", and the School District's exhibits begin with the letters "SD".

The specific purpose of the trust was to "*provide for the supplemental educational needs of the beneficiary pursuant to the* special education hearing officer Rosemary E. Mullaly order dated April 2, 2004." Exhibit A-1/P-1, p.2, emphasis added.

The controlling trust provisions are as follows:

Second: Purpose — This trust is to be primarily an education trust for the beneficiary and secondarily a special needs trust pursuant to 42 USC §1396p(d)(4)(a) and shall be *for the sole benefit of the beneficiary. The purpose of this trust shall be to provide for the beneficiary's supplemental educational needs.* The Trust shall not provide for those needs of the beneficiary which are provided or should be provided under the beneficiary's Individualized Educational Plan (IEP) by a school district or other public agency or governmental program.

A. Educational needs shall mean those requisite items, products or services that can be provided to the beneficiary to assist or supplement the beneficiary's Individualized Educational Plan (IEP).

B. Educational needs shall include but not be limited to teaching assistants, psychiatric/psychological services, recreational therapy, occupational therapy, physical therapy, vocational therapy, durable medical needs, prosthetic devises {sic}, special rehabilitative services or equipment, programs of training, education, transportation and required travel expenses and related insurance.

. . .

Fourth: Use of Principal — Trustee shall have the power to distribute such amount of principal (including accumulated income) as the trustee may from time to time determine to be *necessary or appropriate for the beneficiary's supplemental educational needs.* Expenditures from the Trust fund must have a *reasonable relationship to the educational needs of the beneficiary.* Pursuant to the order of the special education hearing officer, the trustee will *reimburse the parents from the fund for any service recommended in writing by the Kennedy-Kreiger Institute or Dupont that will assist the beneficiary in making up for lost educational opportunity.* If costs are incurred to obtain recommendation, the parents may seek reimbursement from the Trust to obtain these recommendations.

Furthermore, the trustee is authorized to expend from this fund to *pay for those services which the parent and/or trustee notifies the school district in advance where it has failed to provide services to the beneficiary clearly articulated in the students current IEP and which the district has failed to provide.* If the district wishes to challenge the trustee's reimbursement of costs described in this paragraph, it must seek review through the bureau of special educational division of compliance or due process hearing or its objections are deemed waived.

Trustee may pay for the services obtained for the beneficiary starting as of the date of the order of the hearing officer, April 2, 2004, and continuing until December 31, 2010.

Exhibit A-1/P-1, p. 2-4, emphasis added.

The Trust was funded by the School District of

Philadelphia (hereinafter referred to as "School District"), with an initial balance of $216,369.83.[5] The appellants routinely requested and received payments and/or reimbursements from Wells Fargo, with their requests concluding with the statement: "As usual endorse checks to individuals, but forward to me for disbursement."[6]

In accordance with paragraph fifth, the trust terminated on December 31, 2010, and any balance remaining was to be paid to the School District subject to the claim of the Pa. Department of Public Welfare.[7]

Approximately two weeks prior to the trust's termination, the appellants requested Wells Fargo issue checks totaling $133,722.50, which, with the exception of $3,412.50 paid to Freidman Associates, were denied as not within the terms of the trust document.[8] The combined balance of principal and income remaining in the trust as per the account was $117,253.57.[9]

Appellants' prior request for payment of $20,000.00 to Robert B. Gidding, Esquire for federal court litigation was denied by Wells Fargo by letter dated April 27, 2010.[10] Appellants renewed their request and included it in their December requests.[11]

On December 22, 2010, Wells Fargo denied appellants' requests for reimbursement of the $20,000.00 they paid to attorney Gidding, payment of an additional $40,000.00 to attorney Gidding to continue the federal court litigation,

5. Account of Wells Fargo Bank, N.A., exhibit A-2, p.3.
6. Exhibit C-4.
7. Exhibit A-1/P-1, p.4.
8. Exhibits C-4, A-3.
9. Exhibit A-2, p.2.
10. Exhibit A-3.
11. Exhibit C-4.

and payment of $59,560.00 to Potential, Inc. for additional special education services. On January 3, 2011, Wells Fargo denied appellants' requests for reimbursement of the additional $10,000.00 they paid to attorney Gidding and for payment of the Freidman Associates bills of $750.00. Wells Fargo denied the requests claiming they not within the terms of the trust document.[12]

On October 21, 2011, ten (10) months after the trust terminated, the appellants filed their petition for declaratory judgment requesting determination that the above requested expenditures totaling $130,260.00 "have a reasonable relationship to the educational needs of Ferren Chambers" and should be paid by the trust.[13] The School District filed an answer with new matter and counterclaim against the trustees and the Department of Public Welfare.[14] Wells Fargo filed its answer and also filed preliminary objections to the School District's counterclaim.

The trust's first and final account for the period from January 24, 2005 to November 30, 2011, was filed by Wells Fargo on January 17, 2012.[15] and scheduled for audit on March 5, 2012. Wells Fargo raised, as questions for adjudication, the payments requested by appellants in their declaratory judgment petition, taking the position that those requests were not reasonably related to Ferren's educational needs.[16] Objections to the account were filed by the appellants on February 8, 2012, and by the school

---

12. N.T. p. 146, 151, exhibit A-3.
13. Petition for declaratory judgment, control no. 112914.
14. DPW subsequently notified the court and all parties in interest that it was not pursuing any claim against the trust.
15. First and final account and petition for adjudication, control no. 120159.
16. Petition for adjudication, rider to question 13.

district on February 28, 2012.

On August 13, 2012, the trial court sustained Wells Fargo's preliminary objections to the declaratory judgment petition and dismissed the School District's Counterclaim finding that the counterclaim was not a permissible pleading; that all issues alleged in the counterclaim were contained in the School District's Objections to the first and final account.[17]

A consolidated trial on the account, objections, and declaratory judgment petition was held on June 25, 2013. Having assessed the credibility of the witnesses, reviewed all documentary evidence and post-trial submissions, the trial court issued its adjudication and decree, both dated April 28, 2014.

Appellants timely filed their appeals which have now been consolidated by the Superior Court. No appeals or cross appeals were filed by either Wells Fargo or the School District.

### Statement of Issues

Appellants filed their statements of matters complained of on appeal pursuant to Pa. R.A.P. Rule 1925(b) appealing ten issues on the court's adjudication and eight issues on the court's decree on the declaratory judgment petition, many of which are identical. Since the appeals have been consolidated, the trial court has therefore restated the issues for purposes of economy and clarity in a form more amenable to fulfilling its mandate under Pa. R.A.P. Rule 1925(a), as follows:

1. Did the trial court err in interpreting the trust document

---

17. Decree dated August 13, 2012. The trial court note that this issue was not appealed.

finding that attorney fees related to the federal civil rights litigation were not reasonably related to Ferren's educational needs.

2. Did the trial court err in assessing surcharges for improperly paid attorney's fees, for failure to seek reimbursement to the trust from the School District for annual administrative fees paid to Wells Fargo, and for failure to seek reimbursement to the Trust from the attorney fees awarded to the McAndrews Law Offices.

3. Did the trial court err in assessing surcharges against appellants, as co-trustees, who claimed that they had absolutely no control or authority regarding misuse of trust funds.

4. Did the trial court err in not ordering the terminated trust to pay Potential, Inc. and Freidman Associates upon finding that appellants had not shown any damages as a result of the failure to provide educational services.

5. Did the trial court err by failing to award counsel fees to appellants' counsel for this litigation.

## Discussion

1. The Trial Court did not err its interpretation of the Trust document.

A. Attorney fees related to the civil rights litigation are not reasonably related to Ferren's educational needs.

It is well settled that the polestar in interpretation of trust provisions is the settlor's intent. *See, Trust of Hirt*, 832 A.2d 438 (Pa. Super. 2003). The court is bound by the settlor's intent, the rules for which are the same for trusts as for wills and require consideration of: (a) all the language contained in the four corners of the trust, (b)

the settlor's scheme of distribution, (c) the circumstances surrounding the settlor at the time the trust was made, and (d) the existing facts. *See, In re McFadden*, 705 A.2d 930, 931 (Pa. Super. 1998).

At the time of the creation of the trust, the appellants, in their capacities as the settlors and Ferren's parents, were represented by counsel and were integrally involved with their counsel at that time, Stephen J. Pokiniewski, Jr. Esquire, their trust counsel Dana Breslin, Esquire, and "the Wachovia guys" in the drafting and preparation of the trust document pursuant to the Mullaly order.[18] Their signatures as both settlors and trustees appear at the end of the document and are witnessed by their attorney.[19]

Under circumstances such as these, where there is no ambiguity in the trust instrument, extrinsic evidence of the settlor's intent is not merely unnecessary, but not permitted. *See, In re Estate of Harrison*, 689 A.2d 939, 943 (Pa. Super. 1997), Restatement (Second) of Trust, §38. Nevertheless, the trial court permitted the appellants to state their opinions, and both of them articulated that the trust would pay for anything that would contribute to Ferren's educational needs.[20]

The provisions of the trust instrument control. 20 Pa. C.S. §7705(a).

Our Superior Court has held that the court:

"must give effect to every word and clause where reasonably possible so as not to render any provision nugatory or mere surplusage. Further technical words

---

18. N.T. p. 85, 87, 106, 108; exhibit SD-21.
19. Exhibit A-1/P-1, p.6.
20. N.T. p. 32, 58-59.

must ordinarily be given their common legal effect as it is presumed these words were intentionally and intelligently employed, especially where they were used by someone learned in probate law."

*In re Estate of Harrison*, 689 A. 2d 939, 943 (Pa. Super. 1997) (citations omitted).

Accordingly, the trial court analyzed article fourth of the trust containing the provision for the expenditures of principal, giving effect to each and every section, and stating in its adjudication as follows:

In determining whether to distribute trust principal, the trustees must assess whether the expenditure falls within any of the four provisions listed in article fourth, namely:

"Necessary or appropriate for the beneficiary's supplemental educational needs." "Expenditures from the trust fund must have a reasonable relationship to the educational needs of the beneficiary."

"The trustee will reimburse the parents from the fund for any service recommended in writing by the Kennedy-Kreiger Institute or Dupont that will assist the beneficiary in making up for lost educational opportunity. If costs are incurred to obtain recommendation, the parents may seek reimbursement from the trust to obtain these recommendations."

"The trustee is authorized to expend from this fund to pay for those services which the parent and/or trustee notifies the school district in advance where it has failed to provide services to the beneficiary clearly articulated in the students current IEP and which the district has

failed to provide."[21]

By its very language, the trustees were not limited to any one particular category. They were given broad discretion *provided* the expenditure would benefit Ferren's educational needs.

When questioned, the appellants' own testimony demonstrated their knowledge of the trust's language. Appellant Leslie Chambers testified that she believed that trust would pay for anything that benefitted Ferren educationally.[22] Appellant Ronald Chambers testified that he believed that the language "reasonable relationship to the educational needs of the beneficiary" meant that the trust would pay for anything that would contribute to the educational needs of Ferren.[23]

Appellants assert that the court interpreted the trust too narrowly in finding that attorney fees related to the federal civil rights litigation were not reasonably related to Ferren's educational needs. Educational needs are defined. Attorney fees are not an enumerated need. Neither appellant could point to any specific provision in the trust document authorizing payment of the attorney fees incurred in the civil rights litigation. The trust was created as the specific administrative remedy for the School District's failure to provide Ferren with a Free and Appropriate Public Education ("FAPE"). Nowhere is there an indication that the trust was to be used as a vehicle to fund litigation for a civil rights action.

No evidence was produced at trial to prove the attorney fees for the civil rights litigation were engendered for

---

21. Trial court adjudication, page 5.
22. N.T. p.32.
23. N.T. p. 58-59.

educational purposes as opposed to damages for the failure to provide those services. The only evidence presented at trial by appellants in support of their position that the attorney fees for the civil rights litigation were reasonably related to Ferren's educational needs, was their assertion that Wells Fargo changed its policy midstream in March/April 2010 by refusing to pay the requested fees.

While appellants' declaratory judgment action and their objections to the account focused on Wells Fargo's denial of the payment of the attorney fees only with respect to attorney Gidding, the School District raised objections to all attorney fees paid by the trust, thus requiring the trial court to examine all attorney fees. That examination ended with the trial court's determination that the litigation in federal court, which has already claimed attorney fees, is for damages, but has not proven to be for "educational needs."

B. Attorney fees for the federal civil rights litigation were not proper principal expenditures.

The appellants are sophisticated individuals who employed numerous counsel over the years, and at all times relevant hereto, acted in their combined fiduciary roles as both the guardians of Ferren's person and estate and as co-trustees of the trust.

Prior to their initiation of the federal civil rights lawsuit, the appellants sought Orphans' Court approval as the co-guardians of Ferren's person and estate to enter into the contingent fee agreement with Anapol, Schwartz, Weiss, Cohan, Feldman & Cohan, P.C and Stephen Pokiniewski, Esquire to pursue litigation against the School District in the federal district court for claims under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act

("RA"), and the Individuals with Disabilities Education Act ("IDEA").[24]

By appellants not requesting disbursements from the trust, their attorney fees were limited to the contingent fee granted.

On November 29, 2007, the District Court rendered its decision in favor of the School District in *Chambers, et al. v. School District of Philadelphia*, Civil Action No. 05-2535.[25]

The appellants, individually and on behalf of Ferren, then engaged the services of David J. Berney, Esquire to appeal the decision to the Third Circuit Court of Appeals. The fee agreement, entered into by the appellants, without court approval, "represented that [they] directed Wachovia Bank, trustee for the special needs trust fund of Ferren Chambers, to forward Law Firm a check in the amount of $15,000 to satisfy the initial retainer."[26] The account reflects payment on October 3, 2008 of $15,000.00 to the Law Offices of David J. Berney, and subsequent payments of $10,000.00 on December 26, 2008 and $10,000.00 on March 16, 2009.[27] Appellants' justification for not obtaining court approval was that it was not required because it was not a contingent fee agreement and "we were paying out of our own pocket."[28]

The Trustees owed a fiduciary duty to Ferren to properly use the trust assets. Mr. Berney's fees were paid by the

---

24. Exhibit C-8, eecree of judge Lazarus dated May 3, 2005.
25. Exhibit SD-6 order, memorandum and opinion dated November 29, 2007 of the honorable Gene E.K. Pratter granting summary judgment in favor the School District on the IDEA, ADA and RA Claims.
26. N.T. p. 76, 116; exhibit C-10, paragraph 4.
27. N.T. P. 117, 118; exhibit A-2 account, p. 10, 11, 12.
28. N.T. p. 116.

trust, not from appellants' "own pocket." They were not used for Ferren's educational needs, but rather to pursue the civil rights litigation in federal court. Wachovia's acquiescence in issuing the checks to the Law Offices of David J. Berney does not justify the appellants' actions or ratify that the payments were proper expenditures of trust principal.

The protracted federal court litigation continued,29[29] with appellants retaining new counsel, Robert B. Gidding, Esquire, again without court approval, because in their opinion, it was not needed, to litigate the remanded ADA and RA claims. Appellants paid him $30,000 from their "own pocket" and requested that the Trust reimburse them for those funds plus pay an additional $40,000.00. Both requests were denied by Wells Fargo as not within the terms of the trust. Interestingly, appellant Ronald Chambers testified he personally paid attorney Gidding between $47,000.00 and $50,000.00,[30] but no supporting documentary evidence was ever presented by appellants confirming the amounts paid, nor was a fee agreement ever produced. Appellants' have now retained yet another attorney without court approval, again reiterating that court approval was not needed because the money is "out of my pocket."[31]

As set forth in detail in the trial court's adjudication, which is incorporated herein by reference as though fully set forth herein, the court analyzed the attorney fees paid and requested for the civil rights litigation, finding that: 1) they were not authorized by the trust, 2) they did not

---

29. Exhibit SD-7 — opinion of the honorable Fisher affirming the district court's grant of summary judgment on the IDEA claim, and remanding the ADA and RA claims to the district court.

30. N.T. p. 119, 120-121.

31. N.T. p. 122

have a reasonable relationship to Ferren's educational needs, 3) they were not necessary or appropriate for Ferren's supplemental educational needs, 4) they were not a service recommended by Kennedy Kreiger or Dupont, and 5) they were not services which the School District failed to provide.[32]

The attorney fees paid by the trust to the Law Officers of David J. Berney totaling $35,000.00 were improper expenditures of trust principal by all co-trustees, appellants and Wachovia, predecessor of Wells Fargo, and as such resulted in a loss to the trust which was properly the subject of a surcharge.

The decision of Wells Fargo not to pay litigation fees in connection with the federal civil rights case to Robert B. Gidding, Esquire was proper.

The trial court has no jurisdiction over the matters raised by the appellants in their federal civil rights litigation, and if successful in their efforts, Appellants' remedy for attorney fees lies with the federal courts, not this trial court.

2. The Trial Court committed no error in assessing surcharges.

The supreme duty of any trustee is "the preservation of the assets of the trust." *In re Estate of Lychos*, 470 A.2d 136, 141 (Pa. Super. 1983). In protecting the trust, the appellants must "exercise such common skill, prudence, and caution as . . . reasonably prudent [people] would exercise in dealing with [their] own property." *Id.* Any fiduciary possessing greater skill is held to a higher burden because of its increased knowledge. *Id.*

---

32. Trial court adjudication, p.8-9

It is well established in the Commonwealth of Pennsylvania that a fiduciary may be surcharged when he causes a loss to the trust. *In re Lux' Estate*, 389 A. 2d 1053, 1057 (Pa. 1978).

The Pennsylvania Supreme Court has held that:

[s]urcharge is the penalty for failure to exercise common prudence, common skill, and common caution in the performance of the fiduciary's duty and is imposed to compensate beneficiaries for loss caused by the fiduciary's want of due care.

*Miller's Estate*, 26 A.2d 320, 321 (Pa. 1978).

The court is authorized to impose a surcharge whenever improper payments are made from the trust. In the matter at hand, all co-trustees are equally responsible for the depletion of the trust and bear equal responsibility in ensuring the recovery of the trust's assets.

The trial court assessed surcharges totaling $76,424.34 against all co-trustees for breach of their fiduciary duties. Wells Fargo has not appealed the trial court's adjudication awarding surcharges against it, and has therefore accepted that it was properly surcharged.

A. The Trial Court committed no error in assessing surcharges for improperly paid attorney's fees.

The account showed payment of attorney fees by the trust totaling $101,304.08, which were objected to in their entirety by the School District, the remainder beneficiary. After careful review and analysis of all payments, the trial court sustained objections and assessed surcharges for the attorney fees paid to the Law Office of David J. Berney totaling $35,000.00 in connection with the federal civil

rights case as set forth above, and to payment of $312.00 to Caryl Oberman which charge was never explained by any of the co-trustees.

By requesting payment from the trust of attorney fees to David J. Berney for their civil rights litigation, the appellants failed to exercise common prudence in interpreting the trust instrument and violated their fiduciary duty to protect the trust.

Wells Fargo, as successor to Wachovia, is equally liable for payment of attorney fees incurred in the federal litigation by the trust. As evidenced by Wells Fargo's later refusal to allow such bills to be paid or reimbursed by the trust, Wells Fargo, as a trust expert and corporate fiduciary, should have been aware that those expenses were not reasonably related to the purpose defined in the trust instrument.

The trust instrument is unambiguous enough so as not to be easily misconstrued, especially by parties so involved as the appellants and Wells Fargo. There is little question that Ferren's educational trust was only intended to cover attorney's fees when those fees were incurred in an effort to directly secure educational services for Ferren.

Further, Ferren's educational trust was neither the only avenue nor the proper avenue for appellants to seek payment of attorney fees. The federal litigation, if successful, would have resulted in the payment of the appellants' attorney fees. Orphans' Court does not have jurisdiction to allow a trust to pay attorney fees not reasonably related to the purpose of the trust. As this court has determined that the fees were not reasonably related to Ferren's educational trust, disbursement of any money from the trust to pay for such fees was improper.

B. The Co-Trustees' failure to seek reimbursement to the Trust from the School District for annual administrative fees paid to Wells Fargo resulted in a loss to the Trust.

Article tenth of the trust sets forth the corporate trustee's compensation and provides that "the Philadelphia School District shall be responsible to pay for the services of the corporate Trustee." It further provides that: "The fee shall be paid from the principal of the trust each year, however the bill shall be presented to the Philadelphia School District for reimbursement."[33]

All co-trustees were aware that Wells Fargo's administrative fees were to be paid by the School District because all co-trustees were involved in the drafting of the trust instrument.[34] Appellants testified that they knew that the bank would be paid "$3,500 per year."[35] When these fees were paid by the trust, it became the responsibility of the co-trustees, as protectors of the trust, to seek reimbursement from the School District. No such reimbursement for the $21,000.00 paid by the trust was sought until March 4, 2011.[36] By failing to timely seek reimbursement of the Trust, the co-trustees waived their right to seek reimbursement from the School District, and violated their fiduciary duty to protect the assets of the trust. Surcharge against the co-trustees for failure to timely seek reimbursement for the administrative fees paid by the trust totaling $21,000.00 was the proper remedy.

C. The Co-Trustees' failure to seek reimbursement to the Trust from the attorney fees awarded to the McAndrews Law Offices resulted in a loss to the Trust.

---

33. Exhibit A-1/P-1, p.4
34. N.T. p.79
35. *Id.*
36. N.T. p. 148; exhibit A-4.

Similarly, all co-trustees were aware that attorney fees were awarded against the School District during litigation handled by the McAndrews Law Offices to obtain services for Ferren, and that these attorneys' fees had already been paid by the trust.

The account reflected payments by the trust to the McAndrews Law Offices totaling $49,320.40.[37] The trial court found that the attorney fees were reasonably related to Ferren's educational needs and a proper trust expenditure; however, there was no justification for the trustees' failure to reimburse the trust from the fees awarded by the District Court. Appellants' fee agreement with McAndrews Law Offices clearly stated that if attorney fees were awarded, all fees paid by the parties would be reimbursed.[38] The co-trustees bore the responsibility of ensuring that the trust was reimbursed from the fee award. While $29,208.06 was eventually returned to the Trust, $20,112.34 was never reimbursed. In violation of their fiduciary duties, the co-trustees made no effort to seek reimbursement of the remainder of the funds expended by the trust. No credible evidence was presented to justify or explain the failure to seek the return of the additional funds to the trust. Therefore, surcharge of $20,112.34 against all co-trustees was proper.

3. The Trial Court committed no error in assessing surcharges against Appellants.

The appellants claim in their 1925(b) Statement that they had "absolutely no control over or authority regarding the funds in the trust." This argument is spurious. As was set forth above, when to their advantage, the appellants

37. Exhibit A-2 account, p.6, 8, 10, 11, 20, 21.
38. Exhibit C-9, p.2

treated the trust as money "out of their own pocket." Now, that their actions are called into question, they claim no control. The appellants' attempt to shift all blame onto Wells Fargo is without merit.

The appellants remain liable for improper disbursements from the trust even if the final disbursement decisions were made by Wells Fargo.

The appellants are in no way excused from their obligation to protect the trust simply because they are laypeople. The appellants were settlors of the trust as well as the trustees, and were thoroughly represented by counsel during the trust's formation, and at all times thereafter. The appellants' degree of involvement in drafting the trust instrument and their testimony is proof that the appellants were familiar with the purpose and terms of the trust.

They had a fiduciary duty to exercise common prudence in protecting the trust's assets and acted in clear violation of that duty by using the trust "as their own pocket" to pay for litigation unrelated to Ferren's educational needs. They failed to ensure the Trust was fully reimbursed from the McAndrews fee award, and they failed to seek reimbursement from the School District for Wells Fargo's annual compensation.

Further, as trustees of Ferren's educational trust and guardians of Ferren's person and estate, appellants were parties in interest. As such, the court was accessible to them any time they disagreed with Wells Fargo's administration of the trust. The appellants made no attempt to contest Wells Fargo's decisions in administering Ferren's trust at any point prior to the trust's termination. The appellants violated their fiduciary duties as co-trustees and are

properly surcharged.

4. The Trial Court committed no error in refusing payment of the Potential, Inc. and Freidman Associates bills by the terminated Trust.

As set forth in the trial court's adjudication, the trial court found that the services to be rendered by Potential Inc. and the services rendered by Dr. Richard Hess of Freidman Associates were reasonably related to Ferren's educational needs. The appellants argue that it was error for the court to have found the services reasonably related and yet have refused to order payment of the bills.

Pursuant to the unambiguous language of paragraph fourth of the trust, the trustees may provide for Ferren's educational services obtained during the period starting April 2, 2004, the date of the Mullaly order, and continuing until the trust's termination on December 31, 2010.[39]

The trust having terminated prior to any services being rendered by Potential, Inc., there was no obligation for any payment to be made by the trust.

The testimony at trial by the service provider, Potential, Inc., from Christine Quinby, the founder and executive director, was that no services were provided by Potential to Ferren in 2010.[40]

Ms. Quinby had met with the appellants and Ferren on December 10, 2010 and submitted her proposal for services. The proposal contained an "estimate of recommended therapeutic hours" with an estimated yearly cost of $59,560.00.[41] The specific hours and rates

---

39. Exhibit A-1/P-1, p.4.
40. N.T. p. 47.
41. Exhibit C-2.

contemplated by the proposal were: 2.5 hours per week per year with a board certified behavior analyst for an annual cost of $13,000.00; 14 hours per week for the 44 weeks when school was in session and 20 hours per week for the 8 weeks when school is not in session with an ABA therapist, for an annual cost of $46,560.[42]

Dr. Richard Hess, the certified school psychologist, who worked with Ferren for a number of years, reviewed the potential proposal and rendered his opinion that the program would be beneficial.[43] His report, generated after his review of the revised potential proposal, was dated December 30, 2010, one day prior to the termination date of the trust.

After the trust terminated, potential did provide services to Ferren for the 2011/2012 school year, which were paid for by the School District.[44] However, that, in and of itself, does not amount to clear and convincing evidence of a breach of a fiduciary duty by Wells Fargo.

The trial court found that the proposed services were reasonably related to Ferren's educational needs. However, no testimony was presented by appellants that Ferren received any actual services from potential *prior* to the trust's termination on December 31, 2010 which required payment. Nor was there any evidence presented by appellants, in their effort to prove that the services were reasonably related to Ferren's educational needs, that the trust's failure to provide payment, prior to the trust's termination for the services that would be rendered after the trust terminated, caused the appellants to advance their own funds or caused a significant delay in obtaining

---

42. *Id.*
43. N.T. p. 96-97, exhibit C-3.
44. N.T. p. 46-47, 97.

services for Ferren.

The Freidman Associates bills for Dr. Hess' review of the Potential, Inc. report and Ferren's IEP submitted for payment by appellants on December 30 and 31, 2010 were not paid by Wells Fargo. They were clearly reasonably related to Ferren's educational needs, however, appellants failed to present any further testimony indicating whether these bills had been paid by appellants or remained outstanding. The only testimony was that Wells Fargo had denied payment from the trust; therefore the court was without sufficient facts to make any further determination.

5. The Trial Court committed no error in failing to award counsel fees to Appellants' counsel for this litigation.

Award of attorney fees is within the sole discretion of the Orphans' Court. *In re Estate of Geniviva*, 480 Pa. Super. 54, 675 A.2d 306, 313, *alloc. den.*, 546 Pa. 666, 685 A.2d 545 (1996). The general rule is that each party is required to pay his or her own counsel fees. *Estate of Wanamaker*, 460 A.2d 824, 825 (Pa. Super. 1983).

The appellants breached their fiduciary duties as co-trustees of the trust as stated above, and thus are not entitled to any award of counsel fees.

## Conclusion

Considering the number of issues raised by the parties, it is hard to believe that they participated in the drafting and execution of the trust instrument which brought them before the trial court. The instrument is clear, unambiguous and not so complicated as to be misinterpreted. Yet assertions have been made that its clear meaning and intent must be redefined by extrinsic evidence, despite controlling law to the contrary. All parties were represented

in the creation of the trust by counsel of extreme expertise with Ferrens's own parents as settlors. Because they were represented and because they were settlors, their attempt to attack the document they helped create, in accordance with controlling precedent, has failed, with the trial court permitting the document to be read as written.

In making this ruling, the trial court was mindful that there has been no previous effort to reform or bring into question the meaning of its terms during the life of the trust, with complaints arising only after its expiration with the unused fund to be otherwise returned to the School District. It was properly determined that the true meaning of the trust cannot lie outside its own four corners.

This court does not find it easy or pleasant to make decisions which seem to limit remedial care to one in such need as Ferren. However this court may only grant relief within the confines of its statutory jurisdiction, which limits it to relief permitted by law as applied to the trust as written.

Fortunately other courts with jurisdiction do exist which can address these concerns. In fact, the appellants continue to be engaged in litigation and are pursuing remedies requested here in other judicial forums. Fortunately for Ferren, they are not under the jurisdictional limitations of the Orphans' Court.

In that all issues have been fully addressed, and the trial court having entered its decision in accordance with controlling precedent, it is respectfully submitted that it be affirmed.